## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL FAMILY PLANNING AND REPRODUCTIVE HEALTH ASSOCIATION; and PUBLIC HEALTH SOLUTIONS, INC., <br><br>            Plaintiffs, <br><br> v. <br><br> ALEX M. AZAR II, in his official capacity as Secretary of the U.S. Department of Health and Human Services; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROGER SEVERINO, in his official capacity as Director of the Office for Civil Rights of the U.S. Department of Health and Human Services; OFFICE FOR CIVIL RIGHTS of the U.S. Department of Health and Human Services, <br><br>            Defendants. | CIVIL ACTION NO. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## <u>INTRODUCTION</u>

1.    Plaintiff National Family Planning & Reproductive Health Association ("NFPRHA") is a non-profit, membership organization comprised of hundreds of health care providers serving millions of low-income uninsured and underinsured patients each year in all fifty states and the District of Columbia. Among its members is Plaintiff Public Health Solutions, Inc. ("PHS"), a non-profit

health care services organization that serves more than 105,000 uninsured and underinsured clients each year in New York.[1]

2.     Plaintiffs challenge a final rule promulgated by the United States Department of Health and Human Services ("HHS" or "Department") that, if allowed to take effect, will directly threaten Plaintiffs' ability to provide—and their patients' ability to access—essential, potentially life-saving medical care.  Further, the challenged rule will only exacerbate health disparities in communities that already struggle to access basic services by imposing crippling costs on medical providers, such as Plaintiffs, that rely on federal funds to serve low-income patients.

3.     The rule, entitled Protecting Statutory Conscience Rights in Health Care, 84 Fed. Reg. 23,170 (May 21, 2019) (to be codified at 45 C.F.R. pt. 88) ("Final Rule" or "Rule"), is scheduled to take effect on July 22, 2019 and is attached as Exhibit A.

4.     The Final Rule encourages and authorizes discrimination by unlawfully granting a wide swath of institutions and individuals broad new rights to refuse to provide health care services and information.  For example, to justify the Rule, HHS cited the case of Tamesha Means, who sought legal redress when she was turned away from a hospital three times in the midst of a miscarriage of a

_____

[1] Unless otherwise specified, this Complaint refers to Plaintiff NFPRHA's members and Plaintiff PHS collectively as "Plaintiffs."

non-viable fetus, developing a life-threatening infection as a result, because the hospital's religious policies prohibited providing her the emergency abortion care she needed.[2]  *See id.* at 23,176 n.27.  HHS also cited the case of Rebecca Chamorro, who is seeking legal redress for being forced to undergo the additional stress, health risks, and cost of two surgical procedures, rather than a single one, because a hospital prohibited her willing doctor from performing a standard postpartum tubal ligation because it was considered sterilization.[3]  *Id.*  In addition, HHS cited the case of Evan Minton, who is seeking legal redress because his scheduled hysterectomy was canceled on the eve of that procedure, despite his doctor's willingness to proceed with that routine operation, because the hospital became aware he was transgender.[4]  *Id.*

    5.    Tellingly, HHS cited each of these cases *not* because it was concerned with the physical, emotional, and dignitary harms these patients suffered when they were illegally prevented from obtaining the care they needed, but because HHS wants the Rule to be used to create more Tamesha Means, Rebecca Chamorros, and Evan Mintons.

---

[2] American Civil Liberties Union, Comment Letter on Proposed Rule Protecting Statutory Conscience Rights in Health Care (hereinafter "ACLU Comment") (Mar. 27, 2018), https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71138.

[3] *Id.*

[4] *Id.*

6.     The Final Rule will also have a devastating effect on the Title X program—the nation's only federally-funded family planning program—by forcing Title X providers, including Plaintiffs, to hire and employ individuals who will withhold and obstruct access to complete, accurate, and unbiased information about abortion from their patients, and forcing Title X grantees to sub-grant these critical Title X funds to entities that will similarly withhold and obstruct access to this care.

7.     Although the Rule primarily purports to interpret and implement three federal statutes, which HHS describes as "conscience-based protections," these statutes are far more limited in scope than the Rule acknowledges.  Indeed, for decades Congress and HHS have balanced these statutes, which provide limited exemptions to certain institutions and individuals receiving certain federal funds, with patient safeguards and in harmony with other federal laws, such as the Title X statute.  Yet despite Congress's and HHS's longstanding intention and understanding that statutes protecting religious refusals to provide health care operate as a shield, not a sword, the Rule categorically privileges providers' religiously motivated objections over the well-being of patients.

8.     As set forth below, HHS lacks legal authority to promulgate the Rule. Moreover, the Rule's provisions radically expand these underlying statutes, contrary to their clear text and purpose, and in conflict with numerous other federal

statutes and the First and Fifth Amendments of the U.S. Constitution.  And, in promulgating the Rule, HHS also failed to satisfy multiple requirements of the APA.

9.      Each of these faults independently renders the Rule unlawful.  Taken together, they demonstrate the fundamental unlawfulness and unworkability of HHS's actions.

10.      Plaintiffs seek a judgment declaring the Rule in excess of statutory authority; not in accordance with law, including the U.S. Constitution; arbitrary, capricious, and an abuse of discretion; and without observance of procedure required by law.  In addition, because the Rule will immediately threaten irreparable harm to Plaintiffs and their patients, Plaintiffs seek a preliminary injunction enjoining the Rule from taking effect, as scheduled, on July 22, 2019. Finally, Plaintiffs also seek an order permanently enjoining the Rule and remanding it to HHS for such further administrative proceedings as may be appropriate.

**<u>JURISDICTION AND VENUE</u>**

11.      The Court has jurisdiction over the claims alleged in this Complaint pursuant to 5 U.S.C. §§ 701–706 (Administrative Procedure Act), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 2202 (injunctive relief).

12.     HHS's promulgation of the Final Rule on May 21, 2019, constitutes a final agency action within the meaning of the APA, 5 U.S.C. §§ 702, 704, and therefore the Rule is judicially reviewable.  Each Plaintiff is a "person" within the meaning of the APA, 5 U.S.C. § 551(2), and is authorized to bring suit under that statute.  5 U.S.C. § 702.

13.     Venue in this judicial district is proper under 28 U.S.C. § 1391(e) because Plaintiff PHS resides in this district.

## PARTIES

14.     Plaintiff NFPRHA is a national, nonprofit membership organization established to ensure access to voluntary, comprehensive, and culturally sensitive family planning and sexual health care services, and to ensure reproductive freedom for all.  NFPRHA represents more than 850 health care organizations and individuals, primarily health care professionals or practitioners, in all fifty states, the District of Columbia, and the territories.  NFPRHA's organizational members include state, county, and local health departments; private, nonprofit family planning organizations; family planning councils; hospital-based clinics; and Federally Qualified Health Centers.

15.     The vast majority of NFPRHA's organizational members, and their network of health centers, receive funds through HHS and are therefore subject to the Rule.  For example, among other members, NFPRHA represents 67 of 90

recipients of grants under Title X of the Public Health Service Act ("PHSA"), which authorizes grants for family planning projects that benefit low-income, uninsured, underinsured, and other women, men, and adolescents.  NFPRHA's Title X-grantee members operate or fund a network of more than 3,500 health centers that provide high-quality family planning and other preventive health services to more than 3.7 million low-income, uninsured, or underinsured individuals each year—roughly 94 percent of all patients served in Title X-funded health centers nationwide.

16.     NFPRHA members reasonably fear that compliance with the Rule will prevent them from continuing to provide the same high-quality, voluntary, and informed reproductive health care they currently provide to their patients.  At the same time, failure to comply with the Rule could subject NFPRHA members to the loss of hundreds of millions of dollars of federal funding without which they cannot operate.  NFPRHA members also reasonably fear that the Rule will threaten the health of the patients they serve by impeding access to comprehensive reproductive health services, other health services (*e.g.*, LGBT-related care), and emergency care.

17.     NFPRHA sues on behalf of all current and future members that receive federal funds that subject them to the Rule, and on behalf of those

members' sub-recipients, employees, staff, volunteers, servants, officers, agents, and patients.

18.     Plaintiff PHS is a not-for-profit corporation organized under the laws of New York and a NFPRHA member, with its headquarters located at 40 Worth Street in New York City.  PHS is dedicated to developing, implementing, and advocating for dynamic solutions to prevent disease and improve community health and serves 105,000 individuals and families through its direct services programs each year.  Together with its two sexual and reproductive health centers and those of its delegates, PHS provides prenatal and family planning services to over 40,000 at-risk patients each year through a network of licensed health centers in New York City.  The organization serves primarily low-income patients; 70% are below the federal poverty level ("FPL"), and over three-quarters are below 200% of the FPL.[5]  PHS serves a diverse patient group, including adolescents and adults, LGBT individuals, immigrants, and people of different races and ethnic groups.

19.     PHS receives a $4.6 million Title X grant, more than 60% of which ($2.8 million) is dispersed to five other organizational sub-recipients (also

---

[5] In 2019, the FPL for a single person is $12,490, and is $25,750 for a family of four in the 48 contiguous states and District of Columbia.  Annual Update of the HHS Poverty Guidelines, 84 Fed. Reg. 1167 (Feb. 1, 2019).  In 2019, 200% of the FPL for a single person in the 48 contiguous states and District of Columbia is $24,980 per year, and is $51,500 for a family of four.

sometimes referred to as delegate agencies or delegates) to provide family planning services to low-income and uninsured New Yorkers. PHS's patients are dependent on publicly subsidized health facilities to receive essential medical care. These services include the provision of contraceptives, reproductive health education, gynecological exams, prenatal care, STD and HIV testing and treatment, and mental health services, as well as pregnancy testing, options counseling, and referrals upon request.

20.    In total, PHS receives $182 million in funds that originate from the federal government—$138 million of which originates from HHS, with PHS receiving $31.4 million of those funds directly from HHS—all of which could be at risk if PHS or any of its delegates are found to be out of compliance with the Final Rule. Without this publicly funded care, PHS's clients and its sub-recipients' clients would likely lack access to this critical, preventive care altogether.

21.    PHS reasonably fears that compliance with the Rule will prevent them (including their delegates) from continuing to provide the same high-quality, voluntary, and informed health care to their patients. Failure to comply with the Rule, however, could subject PHS to the loss of millions of dollars in federal funding, which funds almost all of the family planning services the organization provides. PHS also reasonably fears that the Rule will threaten the health of its patients by impeding access to comprehensive care and emergency services.

22.     PHS sues on its own behalf as well as its employees, staff, volunteers, servants, officers, agents, and patients.

23.     Defendant the Department of Health and Human Services is a cabinet agency within the executive branch of the United States government and is an agency within the meaning of 5 U.S.C. § 552(f).  HHS promulgated the Final Rule and is responsible for its enforcement.

24.     Defendant Alex M. Azar II is the Secretary of Health and Human Services and is sued in his official capacity, as are his successors.

25.     Defendant Office for Civil Rights ("OCR") is the office within HHS to which HHS has delegated its claimed responsibility for enforcing the Final Rule. OCR thus claims authority to initiate compliance reviews, conduct investigations, supervise and coordinate compliance by HHS and its components, and use other enforcement tools to address alleged violations and resolve complaints.

26.     Defendant Roger Severino is the Director of the Office for Civil Rights at HHS.  Defendant Severino is sued in his official capacity, as are his successors.

## RELEVANT FEDERAL STATUTORY BACKGROUND

27.     To understand the impact of the Final Rule on Plaintiffs and their

patients, it is necessary to understand the numerous federal laws that govern the

provision of health care, including health care programs funded by HHS.

### Title X of the Public Health Services Act

28.     The Title X program has been an essential piece of the U.S. health

care system since 1970.  Pub. L. No. 91-572, 84 Stat. 1504 (1970).

29.     As noted above, Plaintiff NFPRHA's members, including Plaintiff

PHS, serve 94% of patients obtaining Title X services nationwide.

30.     Title X grants support family planning projects that offer "a broad

range of acceptable and effective family planning methods and services" to

patients on a voluntary basis, 42 U.S.C. § 300(a), creating a nationwide network of

Title X health care providers.

31.     Title X gives those with incomes below or near the federal poverty

level free or low-cost access to clinical professionals, contraceptive methods and

devices, and testing and counseling services related to reproductive health,

including pregnancy testing and counseling.

32.     The Title X program served more than four million patients in 2017.

33.     Congress has expressly recognized that, in this area of individuals'

reproductive decision-making, Title X requires "explicit safeguards to insure that

the acceptance of family planning services and information relating thereto must be on a purely voluntary basis by the individuals involved." S. Rep. No. 91-1004, at 12 (1970).

34.    Accordingly, Congress has repeatedly and explicitly forbidden HHS from limiting Title X patients' access to medical information; from using Title X funds for involuntary care or directive, non-neutral counseling when a patient is pregnant; or from creating any other unreasonable barriers to patients' ability to make their own informed decisions about, and gain timely access to, the medical care they seek.

35.    Indeed, every year from 1996 to the present, in making appropriations for Title X, Congress has reiterated that it must fund only *voluntary* family planning projects. This echoes two sections of the original Title X enactment. *See* 42 U.S.C. §§ 300, 300a-5. In addition, every year from 1996 to the present, Congress has mandated that within the Title X program, "all pregnancy counseling shall be nondirective." *See* HHS Appropriations Act, 2019, Pub. L. No. 115-245, 132 Stat. 2981, 3070-71 (2018).

36.    Moreover, Title X providers are obligated to provide referrals upon request, particularly in the context of pregnancy testing and counseling. While Title X projects do "[n]ot provide abortion as a method of family planning," a project must:

(i)     Offer pregnant women the opportunity to be provided information and counseling regarding each of the following options:
(A)     Prenatal care and delivery;
(B)     Infant care, foster care, or adoption; and
(C)     Pregnancy termination.

(ii)    If requested to provide such information and counseling, provide neutral, factual information and nondirective counseling on each of the options, and referral upon request, except to any option(s) about which the pregnant woman indicates she does not wish to receive such information and counseling.

42 C.F.R. § 59.5(a)(5).

## Sections 1554 and 1557 of the Affordable Care Act

37.     In the Patient Protection and Affordable Care Act ("PPACA"), which became law in 2010, Congress specifically identified rulemaking that is off limits for HHS, including in the agency's administration of Title X.

38.     Section 1554 of the PPACA prohibits the Secretary of HHS from "promulgat[ing] any regulation" that "creates any unreasonable barriers" or "impedes timely access to health care services"; interferes with medical providers' communications with patients "regarding a full range of treatment options"; restricts "the full disclosure of all relevant information to patients"; or violates "the ethical standards of health care professionals."  42 U.S.C. § 18114.

39.     Section 1557 is the non-discrimination provision of the PPACA. Section 1557 prohibits any health program or activity, any part of which receives

funding from HHS, or any health program or activity that HHS itself administers,

from discriminating on the basis of race, color, national origin, sex, age, or

disability.  *See id.* § 18116(a).

## Title VII of the Civil Rights Act of 1964

40.     For decades, Title VII of the Civil Rights Act of 1964 ("Title VII")

has required employers, including health care providers, to make reasonable

accommodations for current and prospective employees' religious beliefs so long

as doing so does not pose an "undue hardship" to the employer.  42 U.S.C.

§§ 2000e(j), 2000e-2(a).

41.     An "undue hardship" occurs under Title VII when the accommodation

poses a "more than *de minimis* cost" or burden on the employer's business.  *Trans*

*World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977); EEOC Guidelines, 29

C.F.R. § 1605.2(e)(1).

## The Emergency Medical Treatment and Active Labor Act ("EMTALA")

42.     EMTALA states, *inter alia*, that any hospital that receives Medicare

funds and operates an emergency department must stabilize any individual

determined to have an emergency medical condition.  42 U.S.C. § 1395dd(b).

EMTALA defines "to stabilize" to mean "to provide such medical treatment of the

condition as may be necessary to assure, within reasonable medical probability,

that no material deterioration of the condition is likely to result from or occur

during the transfer of the individual from a facility[.]"  *Id.* § 1395dd(e)(3)(A).

### Federal Refusal Statutes

43.    The Rule's purported purpose is to "implement[]" and "enforce[]" a

collection of statutory provisions.  *See* 84 Fed. Reg. at 23,263 (to be codified at 45

C.F.R. § 88.1).  Primary among those are the three federal laws relevant to the

underlying action: the Church Amendments, 42 U.S.C. § 300a-7; the Coats-Snowe

Amendment, *id.* § 238n; and the Weldon Amendment, Consolidated

Appropriations Act, 2017, Pub. L. 115-31, Div. H, § 507(d), 131 Stat. 135, 562

(collectively, "the federal refusal statutes").

### The Church Amendments

44.    Originally sponsored by Senator Frank Church of Idaho, the Church

Amendments refer to a series of laws passed in the 1970s.

45.    Subsections (b) and (c)(1) were enacted in 1973 following a district

court decision that enjoined a Catholic hospital from preventing a physician from

performing a voluntary sterilization procedure on the grounds that the hospital's

receipt of certain federal funds meant it was acting under the color of state law.

*See* H.R. Rep. No. 93-227, at 1473 (1973) (citing *Taylor v. St. Vincent's Hospital*,

369 F. Supp. 948, 950 (D. Mont. 1973)).

46.    In response to this and similar instances, Congress passed a law to make clear that the receipt of certain federal funds does not, in itself, obligate individuals or entities to provide abortion or sterilization services.  *See, e.g.*, 119 Cong. Rec. S9599-601 (daily ed. Mar. 27, 1973) (statement of Sen. Church).

47.    Church Subsection (b) thus provides that the receipt of federal funds under the PHSA[6] does not authorize a court or other "public official" to require an individual "to perform or assist in the performance of any sterilization procedure or abortion" if it would be "contrary to his religious beliefs or moral convictions," or an entity "to make its facilities available for the performance of any sterilization procedure or abortion if the performance of such procedure or abortion in such facilities is prohibited by the entity on the basis of religious beliefs or moral convictions" or "provide any personnel for the performance or assistance in the performance of any sterilization procedure or abortion if the performance or assistance in the performance of such procedures or abortion by such personnel would be contrary to the religious beliefs or moral convictions of such personnel." 42 U.S.C. § 300a-7(b).

---

[6] As the Final Rule acknowledges, although subsections (b), (c), and (e) of the Church Amendments also apply to recipients of funds under the Community Mental Health Centers Act, and subsections (b) and (c) to recipients of the Developmental Disabilities Services and Facilities Construction Act, those statutes have since been repealed.  Thus, the Final Rule only purports to implement Church subsections (b) and (c)(1) with respect to recipients of PHSA funding.  *See* 84 Fed. Reg. 23,171 n.3.

48.     Subsection (c)(1) of the Church Amendment, also enacted in 1973, prohibits recipients of PHSA funds from "discriminat[ing] in the employment, promotion, or termination of employment" or "in the extension of staff or other privileges" to "any physician or other health care personnel" because the individual performed a sterilization or abortion or refused to perform such a procedure on the grounds it "would be contrary to his religious beliefs or moral convictions," or because of the individual's "religious beliefs or moral convictions respecting sterilization procedures or abortions."  *Id.* § 300a-7(c)(1).

49.     During debate over these provisions, Senator Church made clear it was not his intent to permit "a nurse or attendant somewhere in the hospital who objected" to an abortion or sterilization to "*veto the rights of a physician and the rights of patients* to have a procedure which the Supreme Court has upheld," nor was the "intention . . . to permit a frivolous objection from someone unconnected with the procedure to be the basis for a refusal to perform what would otherwise be a legal operation."  119 Cong. Rec. S9597 (daily ed. Mar. 27, 1973) (emphasis added).

50.     Senator Church also clarified that "this amendment would not in any way affect sterilizations or abortions in publicly owned hospitals," *id.* at S9600, and that "[i]n an emergency situation—life or death type—no hospital, religious or not, would deny such services," *id.* at S9601.

17

51.     Congress subsequently passed subsections (c)(2) and (d) of the

Church Amendment in 1974.  At that time, the Senate was considering a law, the

National Research Act, which addressed funding for biomedical and behavioral

research and sought to ensure that such research projects involving human subjects

were conducted ethically.  *See* 119 Cong. Rec. S29,213-32 (daily ed. Sept. 11,

1973).

52.     To that end, subsection (c)(2) prohibits any recipient of "a grant or

contract for biomedical or behavioral research under any program administered by

[HHS]" from engaging in the same forms of discrimination as prohibited by (c)(1)

because of a refusal

> to perform or assist in the performance of any such service or
> activity on the grounds that his performance or assistance in the
> performance of such service or activity would be contrary to his
> religious beliefs or moral convictions, or because of his
> religious beliefs or moral convictions respecting any such
> service or activity.

42 U.S.C. § 300a-7(c)(2).

53.     Subsection (d), which was also adopted as part of the National

Research Act, states:

> [N]o individual shall be required to perform or assist in the
> performance of any part of a health service program or research
> activity funded in whole or in part under a program
> administered by [HHS] if his performance or assistance in the
> performance of such part of such program or activity would be
> contrary to his religious beliefs or moral convictions.

*Id.* § 300a-7(d).

54.    Subsection (e), enacted in 1979, prohibits recipients of "any grant, contract, loan, loan guarantee, or interest subsidy" under the PHSA or the Developmental Disabilities Assistance and Bill of Rights Act of 2000 from discriminating against applicants to training programs due to reluctance or willingness to participate in abortions or sterilizations "contrary to or consistent with the applicant's religious beliefs or moral convictions." *Id.* § 300a-7(e).

## The Coats-Snowe Amendment

55.    In 1996, Congress adopted the Coats-Snowe Amendment to establish a narrow right to refuse to participate in medical training for abortion.

56.    Congress was motivated to act in response to a decision by the Accrediting Council for Graduate Medical Education to require OB/GYN residency programs to provide opt-out abortion training beginning January 1, 1996.

57.    The Coats-Snowe Amendment specifically prohibits the federal government or "any State or local government that receives Federal financial assistance" from discriminating against "any health care entity"—defined to include "an individual physician, a postgraduate physician training program, and a participant in a program of training in the health professions"—that refuses to perform abortions, undergo training in how to perform abortions, provide referrals for abortions or such training, or "make arrangements" for such activities, or that

attended a postgraduate training program that did not include abortion training. *Id.* § 238n(a), (c)(2).

58.   The Amendment also requires federal, state, and local governments to accredit training programs that would otherwise be accredited but for their refusal to provide or refer for abortions, but allows accrediting agencies to "establish[] standards of medical competency applicable only to those individuals who have voluntarily elected to perform abortions." *Id.* § 238n(b).

59.   Senator Coats clarified that the Amendment was not intended to interfere with training for, and therefore the provision of, emergency abortion care. *See* 142 Cong. Rec. 5165 (daily ed. Mar. 19, 1996) (statement of Senator Coats) ("[A] resident needs not to have performed an abortion on a live, unborn child, to have mastered the procedure to protect the health of the mother if necessary."); *id.* at 5166 (statement of Senator Coats) ("[T]he similarities between the procedure which [residents] are trained for, which is a D&C procedure, and the procedures for performing an abortion are essentially the same and, therefore, [residents] have the expertise necessary, as learned in those training procedures, should the occasion occur and an emergency occur to perform that abortion.").

### The Weldon Amendment

60.   The Weldon Amendment has been added to each appropriations act for the Departments of Labor, HHS, and Education since Fiscal Year 2005.

61.    The Weldon Amendment prohibits appropriated funds from being made available to any "Federal agency or program, or to a State or local government," if it "subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."  Pub. L. 115-31, Div. H, § 507(d)(1).

62.    The Amendment defines "health care entity" to include "an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan."  *Id.* § 507(d)(2).

63.    Representative Weldon directly addressed concerns about whether the Amendment applies to emergencies or whether it overrides EMTALA.  He said:

> Hyde-Weldon does nothing [to deny women "access to an abortion needed to save the life of the mother"].  It ensures that in situations where a mother's life is in danger a health care provider must act to protect the mother's life.
>
> In fact, Congress passed the Federal Emergency Medical Treatment and Active Labor Act (EMTALA) forbidding critical-care health facilities to abandon patients in medical emergencies, and requires them to provide treatment to stabilize the medical condition of such patients - particularly pregnant women.

151 Cong. Rec. H177 (daily ed. Jan. 25, 2005); *see also* 150 Cong. Rec. H6817 (daily ed. Sept. 8, 2004) (statement of Representative Weldon) ("The policy simply states that health care entities should not be forced to provide elective abortion.").

*     *     *

64.     No provision of the Church, Coats-Snowe, or Weldon Amendments, nor of any other statute, authorizes HHS to promulgate force-of-law regulations to interpret the federal refusal statutes.

## 2008 RULEMAKING UNDER THE FEDERAL REFUSAL STATUTES

65.     The substance of the Church, Coats-Snowe, and Weldon Amendments has remained unchanged for years.  HHS did not attempt to issue guidance or promulgate regulations interpreting or implementing these laws until 2008.

66.     In August 2008, HHS published a proposed rule purporting to implement the federal refusal statutes.  *See* Ensuring that Health and Human Services Funds Do Not Support Coercive or Discriminatory Policies or Practices in Violation of Federal Law, 73 Fed. Reg. 50,274 (Aug. 26, 2008).  An earlier, leaked draft of the proposed rule contained a definition of abortion that seemed to cover many common forms of hormonal birth control.  This re-definition of abortion sparked immediate controversy and was not included in the rule HHS ultimately proposed in 2008.

67.     Even without the re-definition of abortion, the 2008 proposed rule engendered widespread condemnation.  Leading medical associations, U.S. Senators, members of Congress, state attorneys general, and thousands of others counted among the 200,000 commenters who weighed in during an abbreviated

30-day comment period, overwhelmingly raising substantial issues with the proposal and urging HHS not to finalize the rule.

68.    On December 19, 2008, HHS published a final regulation, which was virtually identical to its proposal.  *See* Ensuring that Department of Health and Human Services Funds Do Not Support Coercive or Discriminatory Policies or Practices in Violation of Federal Law, 73 Fed. Reg. 78,072 (Dec. 19, 2008) (codified at 45 C.F.R. pt. 88) ("2008 Rule").

69.    The 2008 Rule was immediately subject to litigation by advocacy groups (including Plaintiff NFPRHA) and multiple states raising, *inter alia*, HHS's lack of rulemaking authority under the federal refusal statutes; the rule's unreasonable definitions, interpretations, and attempted expansion of the Church, Coats-Snowe, and Weldon Amendments; its fundamental conflicts with the U.S. Constitution and other federal laws; and the rule's multiple APA violations, including HHS's failure to address significant public comments.  *See, e.g.*, *Nat'l Family Planning & Reprod. Health Ass'n v. Leavitt*, No. 09-cv-00055 (D. Conn. Jan. 15, 2009); *State of Conn.  v. United States*, No. 09-cv-00054 (D. Conn. Jan. 15, 2009); *Planned Parenthood Fed'n of Am. v. Leavitt*, No. 09-cv-00057 (D. Conn. Jan. 15, 2009).

70.    In March 2009, prior to the resolution of the lawsuits, HHS proposed to rescind the 2008 Rule in its entirety.  Rescission of the Regulation Entitled

"Ensuring that Department of Health and Human Services Funds Do Not Support

Coercive or Discriminatory Policies or Practices in Violation of Federal Law," 74

Fed. Reg. 10,207 (Mar. 10, 2009).  The lawsuits were stayed pending the outcome

of rulemaking.  *See State of Conn. v. United States*, No. 09-cv-00054.

71.    In 2011, HHS promulgated a final rule rescinding the 2008 Rule,

though not in its entirety.  *See* Regulation for the Enforcement of Federal Health

Care Provider Conscience Protector Laws, 76 Fed. Reg. 9968, 9976-77 (Feb. 23,

2011) (codified at 45 C.F.R. pt. 88) ("2011 Rule").

72.    HHS stated it was important to rescind the majority of the 2008 Rule

because, in "attempting to clarify the Federal health care provider conscience

statutes," HHS had "instead led to greater confusion," *id.* at 9969, and could

"negatively affect the ability of patients to access care," *id.* at 9974.  In particular,

HHS explained that it was rescinding the 2008 Rule to "clarify [the] mistaken

belief that [it had] altered the scope of information that must be provided to a

patient by their provider in order to fulfill informed consent requirements."  *Id.* at

9973.  HHS also stated that the protections in the 2008 Rule should not "allow

providers to refuse to provide medical care to an individual because the individual

engaged in behavior the health care provider found objectionable."  *Id.* at 9973–74.

73.    On the other hand, the 2011 Rule stated that "the Department supports

clear and strong conscience protections for health care providers," *id.* at 9969, and

that it would therefore retain the provision of the 2008 Rule designating OCR to receive and coordinate the handling of complaints based on the federal refusal statutes, *id.* at 9976–77.  However, HHS deleted all references to the Church, Coats-Snowe, and Weldon Amendments as sources of rulemaking authority for this provision, stating that "none of these statutory provisions require promulgation of regulations for their interpretation or implementation."  *Id.* at 9975.

## 2018 RULEMAKING AND THE FINAL RULE

### 2018 Notice of Proposed Rulemaking

74.    Between 2008 and January 2018, OCR received fewer than fifty complaints alleging discrimination against health care providers in violation of federal refusal statutes, the large majority of which were filed since the November 2016 election.  *See* Protecting Statutory Conscience Rights in Health Care; Delegations of Authority, 83 Fed. Reg. 3880, 3886 (Jan. 26, 2018) (to be codified at 45 C.F.R. pt. 88).  To place that figure into context, OCR in total received over 30,000 complaints of discrimination against *patients* in fiscal year 2017 alone.[7]

75.    There is no evidence OCR in any way mishandled or failed to take seriously the limited number of complaints alleging violations of the federal refusal statutes; similarly, there is no evidence that the federal refusal statutes have failed

---

[7] *Putting America's Health First: FY 2019 Budget*, Dep't of Health & Human Services, 124 (Feb. 19, 2018), https://www.hhs.gov/sites/default/files/fy-2019-budget-in-brief.pdf.

to adequately protect those who have a religious or moral objection to providing certain health care.[8]

76.    Despite the lack of evidence of a problem, on January 18, 2018, HHS announced the creation of a new "Conscience and Religious Freedom Division" within HHS charged with protecting health care providers who refuse to provide health care.[9]

77.    The next day, on January 19, 2019, the Office of Information and Regulatory Affairs ("OIRA") released the proposed version of the Final Rule ("Proposed Rule") to the public.

78.    On January 26, 2018, HHS published its Notice of Proposed Rulemaking in the Federal Register, triggering a 60-day public comment period. 83 Fed. Reg. 3880.

79.    As in 2008, by providing expansive definitions of key statutory terms, the Proposed Rule transformed the very limited exemptions for specified health care providers and entities under the federal refusal statutes into a sweeping right for virtually any entity in receipt of certain government funding, or individual

---

[8] *See, e.g.*, Letter from Linda Colon, Regional Manager, HHS, to  Matthew Bowman & David Reich, M.D. (Feb. 1, 2013), http://www.adfmedia.org/files/Cenzon-DeCarloHHSfindings.pdf.

[9] Office for Civil Rights, *HHS Announces New Conscience and Religious Freedom Division*, Dep't Health & Human Services (Jan. 18, 2018), https://www.hhs.gov/about/news/2018/01/18/hhs-ocr-announces-new-conscience-and-religious-freedom-division.html.

employed by that entity, to refuse to provide a broad range of procedures, services, and information, including in cases of medical emergency.

80.    The Proposed Rule also created and assigned to OCR broad and coercive enforcement powers that would allow HHS to cut off or claw back potentially billions of dollars of federal health care funds for alleged failure to comply with the rule.[10]

81.    In one notable change from the 2008 proposed rule, the new Proposed Rule did not purport to extend the federal refusal statutes dealing with abortion to permit refusals to provide, assist in the performance of, or provide referrals for contraceptives.

82.    HHS justified the Proposed Rule by citing as the "problem" cases in which patients sought remedies after being denied health care—to the detriment of their health and often for discriminatory reasons.  *See* 83 Fed. Reg. at 3888-89, n.36.  It is plain that HHS sought to make these types of refusals *more* commonplace under the Rule.

83.    HHS received more than 72,000 comments at the conclusion of the 60-day public comment period on the Proposed Rule, a substantial majority of them negative.

---

[10] *See generally* ACLU Comment; National Family Planning & Reproductive Health Association, Comment Letter on Proposed Rule Protecting Statutory Conscience Rights in Health Care (hereinafter "NFPRHA Comment") (Mar. 27, 2018), https://www.regulations.gov/document?D=HHS-OCR-2018-0002-70260.

84.    Comments opposing the Proposed Rule were submitted by numerous

organizations and individuals, including:

- Medical professional associations, such as the American Academy of

  Family Physicians, American Academy of Pediatrics, American

  Academy of Pharmacists, American College of Obstetricians and

  Gynecologists, American Hospital Association, American Medical

  Association[11];

- States and cities, as well as state public health and insurance

  departments[12];

---

[11] *E.g.,* American Academy of Family Physicians, Comment Letter on Proposed Rule Protecting Statutory Conscience Rights in Health Care (hereinafter "American Academy of Family Physicians Comment") (Mar. 29. 2018), https://www.regulations.gov/document?D=HHS-OCR-2018-0002-34646; American Academy of Pediatrics, Comment Letter on Proposed Rule Protecting Statutory Conscience Rights in Health Care (hereinafter "American Academy of Pediatrics Comment") (Mar, 29, 2018), https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71048; American Academy of Pharmacists, Comment Letter on Proposed Rule Protecting Statutory Conscience Rights in Health Care (hereinafter "American Academy of Pharmacists Comment") (Mar. 29. 2018), https://www.regulations.gov/document?D=HHS-OCR-2018-0002-65085; American College of Obstetricians and Gynecologists, Comment Letter on Proposed Rule Protecting Statutory Conscience Rights in Health Care (hereinafter "American College of Obstetricians and Gynecologists Comment") (Mar. 29. 2018), https://www.regulations.gov/document?D=HHS-OCR-2018-0002-70647; American Hospital Association, Comment Letter on Proposed Rule Protecting Statutory Conscience Rights in Health Care (hereinafter "American Hospital Association Comment") (Mar. 29. 2018) https://www.regulations.gov/document?D=HHS-OCR-2018-0002-65761; American Medical Association, Comment Letter on Proposed Rule Protecting Statutory Conscience Rights in Health Care (hereinafter "American Medical Association Comment") (Mar. 29. 2018), https://www.regulations.gov/document?D=HHS-OCR-2018-0002-70564.

[12] *E.g.*, City of New York, Comment Letter on Proposed Rule Protecting Statutory Conscience Rights in Health Care (hereinafter "City of New York Comment") (Mar. 29, 2018), https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71028; City of Miami Beach, Comment Letter on Proposed Rule Protecting Statutory Conscience Rights in Health Care

- State officials, including at least 20 State Attorneys General; associations of state health officials such as the National Association of County and City Health Officials and the National Alliance of State & Territorial AIDS Directors[13];

- Former EEOC officials[14]; and

- Federal officials, including more than 100 members of the House of Representatives.[15]

---

(hereinafter "City of Miami Beach Comment") (Mar. 29, 2018), https://www.regulations.gov/document?D=HHS-OCR-2018-0002-32207; State of Washington Department of Health, Comment Letter on Proposed Rule Protecting Statutory Conscience Rights in Health Care (hereinafter "State of Washington Comment") (Mar. 29, 2018), https://www.regulations.gov/document?D=HHS-OCR-2018-0002-65558; Dave Jones, State of California Insurance Commissioner, Comment Letter on Proposed Rule Protecting Statutory Conscience Rights in Health Care (hereinafter "Jones Comment") (Mar. 27, 2018), https://www.regulations.gov/document?D=HHS-OCR-2018-0002-70956.

[13] State Attorneys General, Comment Letter on Proposed Rule Protecting Statutory Conscience Rights in Health Care (hereinafter "State Attorneys General Comment") (Mar. 29, 2018), https://www.regulations.gov/document?D=HHS-OCR-2018-0002-70188; National Association of County and City Health Officials, Comment Letter on Proposed Rule Protecting Statutory Conscience Rights in Health Care (hereinafter "National Association of County and City Health Officials Comment") (Mar. 29, 2018), https://www.regulations.gov/document?D=HHS-OCR-2018-0002-70228; HIV Medical Association, Comment Letter on Proposed Rule Protecting Statutory Conscience Rights in Health Care (hereinafter "HIV Medical Association Comment") (Mar. 29, 2018),  https://www.regulations.gov/document?D=HHS-OCR-2018-0002-69268.

[14] 14 Former EEOC Officials, Comment Letter on Proposed Rule Protecting Statutory Conscience Rights in Health Care (hereinafter "Former EEOC Officials Comment") (Mar. 29, 2018), https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71178.

[15] Members of U.S. House of Representatives, Comment Letter on Proposed Rule Protecting Statutory Conscience Rights in Health Care (hereinafter "House of Representatives' Comment") (Mar. 29, 2018), https://www.regulations.gov/document?D=HHS-OCR-2018-0002-70254.

85.     These comments identified myriad ways in which the Proposed Rule would improperly expand the reach of the federal refusal statutes and wreak havoc for patients and providers across the country.  In particular, numerous comments identified the conflict between the Proposed Rule and the Title X program, as well as numerous other federal laws.

86.     Prior to the promulgation of the Final Rule, on May 1, 2019, OCR revised its website to include a new mission statement.  Whereas OCR's longstanding mission had been to "improve the health and well-being of people across the nation" and "to ensure that people have equal access to and the opportunity to participate in and receive services from HHS programs without facing unlawful discrimination,"[16] the revised statement declared OCR's intention to operate as a "law enforcement agency," prioritizing the enforcement of federal refusal statutes.[17]

**The Final Rule**

87.     On May 21, 2019, HHS published the Final Rule.

---

[16] Rachel Bergman, *HHS Office for Civil Rights Overhauled Its Mission and Vision Sstatements on Its Website*, Sunlight Foundation (May 1, 2019), https://sunlightfoundation.com/2019/05/01/hhs-office-for-civil-rights-overhauled-its-mission-and-vision-statements-on-its-website/.

[17] Dep't of Health & Human Servs., *OCR Mission and Vision*, https://www.hhs.gov/ocr/about-us/leadership/index.html (last accessed May 6, 2019) (listing as one of three OCR priorities "Ensuring that HHS, state and local governments, health care providers, health plans, and others comply with federal laws that guarantee the protection of conscience and free exercise of religion and prohibit coercion and religious discrimination in HHS-conducted or funded programs.").

88.    The Final Rule sets forth various requirements and prohibitions purporting to interpret and implement the federal refusal statutes.  *See* 84 Fed. Reg. 23,170 at 23,264–69

89.    As set forth in the examples below, the Final Rule provides broad and unprecedented definitions of key statutory terms that have the effect of expanding the scope of the federal refusal statutes beyond their plain meaning and Congressional intent.  *See id.* at 23,264–69.

90.    The Rule also purports to grant broad enforcement authority to OCR, *see id.*, including the authority to strip Plaintiffs of millions of dollars in federal funding*, id.* at 23,269–72.

91.    As in the Proposed Rule, the Final Rule cited cases where individuals had sought legal redress after being denied essential, even emergency, care as a justification for the Rule.  *See id*. at 23,176.

*The Final Rule's Definitions*

**"Discriminate" or "Discrimination"**

92.    The Rule provides a broad and unfounded definition of the terms "discriminate" and "discrimination" for purposes of Church Subsection (c) and the Coats-Snowe and Weldon Amendments, set forth *supra* in ¶¶ 48–52, 55–63, which

goes well beyond the common understanding of those terms and Congressional intent.[18]

93.   **<u>First</u>**, the Final Rule expressly rejects Title VII's longstanding framework for balancing religiously motivated refusals to provide care with patient safety. *See id.* at 23,191 (explaining that the Rule "will differ from Title VII . . . by not incorporating the additional concept of an 'undue hardship' exception for reasonable accommodations").

94.   Instead, the Rule's new definition of "discriminate" or "discrimination" eliminates any notion of a "reasonable accommodation" and instead imposes a virtually absolute obligation to accommodate employee objections, regardless of impact, giving employees carte blanch to refuse to do core aspects of their job and yet stay in their role.  For example, the Final Rule:

- prohibits covered entities from asking job applicants whether they are willing to perform any aspect, even essential elements, of the position, *id.* at 23,263 (to be codified at 45 C.F.R. § 88.2);

- prohibits covered entities from asking existing employees if they object to performing a given job function more than once per calendar year without "persuasive justification" (undefined), *id.*; and

---

[18] *See* ACLU Comment at 9, 11; NFPRHA Comment at 8–10.

- prohibits covered entities from taking any steps to protect patient access to medical services and information, even in emergencies, unless those steps are "voluntarily accept[ed]" by the objecting employee, do not require any "additional action" from the objecting employee, or do not otherwise constitute an "adverse action" (undefined) against the objecting employee, *id.*

95.    This dramatic revision of the legal obligations of covered entities, such as Plaintiffs, will make it difficult, if not impossible, for health care providers to ensure patients continue to receive the care they need and to which they are legally entitled.

96.    For example, even though Congress has repeatedly affirmed that providing Title X patients with comprehensive and unbiased information about their pregnancy options is a core aspect of the program, *see supra* ¶¶ 30–36, the new definition of "discriminate" would make it impossible for Plaintiffs to require their employees to perform this essential job function, or even ask job applicants whether they would be willing to do so.  *See* 84 Fed. Reg. at 23,265 (to be codified at 45 C.F.R. § 88.3(a)(2)(iv)).

97.    Likewise, under the Rule, a hospital could not prevent its employees from withholding or otherwise obstructing transgender patients from obtaining gender-affirming surgeries, or even information about those surgeries, because

those surgeries can be considered "sterilizing" procedures.  *See id.*  Nor could

hospitals even inquire of job applicants whether they would withhold or otherwise

obstruct patients from obtaining such lawful care.  *See id.*

98.    The definition's categorical accommodation requirement was not

included in the proposed rule.  *See* 83 Fed. Reg. at 3923–24 (proposed definition of

discrimination).  Accordingly, HHS provided no notice of and solicited no

comments on this unprecedented expansion of the meaning of the terms

"discriminate" or "discrimination."

99.    **Second**, the Final Rule explains that the definition is intended to

prohibit state and local governments that receive federal funds from enforcing

"neutral laws of general applicability" even though they are not by their "text,

history, motive, or operation targeted at the protected activity of religious

exercise."  84 Fed. Reg. at 23,189–90.

100.   For example, even though Congress has repeatedly affirmed that

providing Title X patients with comprehensive and unbiased information about

their pregnancy options is a core aspect of the program, *see supra* ¶¶ 30–36, under

the Rule a state or local governmental Title X grantee could no longer require sub-

recipients to comply with Title X's statutory requirements.  *See* 84 Fed. Reg. at

23,265 (to be codified at 45 C.F.R. § 88.3(b), (c)).

101.   Similarly, even though Congress never intended the federal refusal statutes to apply in emergencies, *see supra* ¶¶ 49, 59, 63, under the Rule, a state or local government that receives federal funds—and even the federal government itself—could not enforce EMTALA (or similar state laws) against hospitals that refuse to provide emergency abortions.  *See id.* at 23,265 (to be codified at 45 C.F.R. § 88.3(b), 88.3(c)).

**"Assist in the Performance"**

102.   The Rule's broad and unfounded definition of "assist in the performance" for purposes of the Church Amendments, as set forth in *supra* ¶¶ 47–53, includes any action that has a "specific, reasonable, and articulable connection" to "furthering" a procedure otherwise performed by someone else, including but not limited to "counseling, referral, training, or otherwise making arrangements" for the procedure or service, "depending on whether aid is provided by such actions."  *Id.* at 23,263.

103.   In direct contravention of Congress's intent in passing the Church Amendments, *see supra* ¶¶ 49–50, and the plain meaning of the term, this new definition is so broad that it means an individual could refuse to, *e.g.*, schedule an appointment, admit a patient to a health care facility, update information in a patient's chart, transport a patient from one part of the facility to another, or even

take a patient's temperature as any of those activities has a "specific, reasonable, and articulable connection" to "furthering" the service.  *Id.* at 23,263.[19]

104.   Moreover, despite the fact that Congress has repeatedly affirmed that providing Title X patients with comprehensive and unbiased information about their pregnancy options is a core aspect of the program, the definition of "assist in the performance" would allow an individual to withhold information about abortion from a patient, even in an emergency.  Even monitoring or otherwise ensuring that a Title X sub-recipient is complying with the legal requirement to provide nondirective pregnancy options counseling, including abortion referral, could be considered having a "specific, reasonable, and articulable connection" to "furthering" abortion.  This only further impedes the ability of Title X providers to ensure they provide the full scope of services mandated by law and of Title X grantees to ensure that their sub-recipients comply with the legal requirements of the Title X program, and ensure that their patients are provided proper care.

105.   In addition, Church subsections (c)(2) and (d) are not limited to PHSA funds and apply beyond abortion and sterilization to "any lawful health service [activity]" or "any part of a health service program."  *Id.* at 23,265.  As such, the Rule's definition of "assist in the performance" could embolden individuals to refuse to provide a broad range of other health care services and information,

---

[19] *See* ACLU Comment at 7–8, 14–16, 18; NFPRHA Comment at 4–5, 8.

including about contraceptives or LGBT-related care, even though Sections 1554 and 1557 of the PPACA prevent HHS from imposing barriers and sanctioning discrimination in health care access.

**"Referral" and "Refer for"**

106.   The Rule's broad and unfounded definition of the terms "referral" and "refer for" for purposes of the Coats-Snowe and Weldon Amendments includes the provision of *any* "information in oral, written, or electronic form," if "the purpose or reasonably foreseeable outcome" of providing that information is "to assist a person in receiving funding or financing for, training in, obtaining, or performing" a health care service or procedure.  *Id.* at 23,264.  However, this understanding of "referral" or "refer for," where even telling a patient that abortion is an option becomes a referral under the Rule, contravenes the ordinary understanding of the term.[20]

107.   As above, despite the fact that Congress has repeatedly affirmed that providing Title X patients with comprehensive and unbiased information about their pregnancy options is a core aspect of the program, this definition would allow an individual to withhold information about abortion from a patient, even in an emergency.  Thus, as above, this new definition further impedes the ability of state and local governmental Title X providers to ensure they provide the full scope of

---

[20] *See* ACLU Comment at 7–9, 12, 14–18; NFPRHA Comment at 5, 8.

services mandated by law, and of Title X grantees to ensure that sub-recipients

comply with the legal requirements of the Title X program.

*The Final Rule's Compliance and Enforcement Requirements*

108.   Failure to comply with the Rule to HHS's satisfaction—or the failure

of one of their sub-recipients to do so—could lead to the loss of Plaintiffs' federal

funding and jeopardize Plaintiffs' ability to obtain federal funding in the future.

This, in turn, could force Plaintiffs to reduce or discontinue providing critical

health care services, if not force the outright closure of numerous health care

facilities that provide essential care to underserved communities.[21]

109.   For example, the Rule requires, with narrow exceptions, that "as a

condition of the approval, renewal, or extension of any Federal financial assistance

or Federal funds" from HHS, an entity must furnish both an assurance and

certification of compliance with the Final Rule and the underlying federal refusal

statutes.  *Id.* at 23,269 (to be codified at 45 C.F.R. § 88.4(a)(1)–(2)) (emphasis

added).  Entities already in receipt of federal funds as of the effective date of the

Final Rule shall submit the required assurance and certification "as a condition of

any application or reapplication for funds" or "as a condition of an amendment or

modification of the instrument that extends the term of such instrument or adds

additional funds to it."  *Id.* (to be codified at 45 C.F.R. § 88.4(b)).  Failure to

---

[21] *See* ACLU Comment at 18–20; NFPRHA Comment at 1, 6–7.

comply with the assurance or certification requirements subjects covered entities to the enforcement mechanisms and penalties set forth *infra* at ¶¶ 113–116. *See id.* at 23,271–72 (to be codified at 45 C.F.R. § 88.7).

110.   Such assurances will be difficult, if not impossible, to provide.  For example, as discussed *supra* in ¶¶ 93–98, the Final Rule's vague and unworkable requirements do not provide sufficient guidance to Plaintiffs on how to structure their hiring and employment practices to both satisfy the terms of the Rule *and* continue to serve their patients' needs in a manner consistent with the standard of care.  This precarious position is exacerbated by the Final Rule's many conflicts with other federal laws, including Title X, which leave covered entities to guess at how they can possibly comply with *all* their federal obligations—and then to blindly attest to the adequacy of their plan.

111.   However, Plaintiffs' compliance obligations do not only come into being upon submission of the required assurances and certifications.  The Rule requires covered entities at all times to maintain records "evidencing compliance." As one example, the Final Rule provides that OCR will consider an entity's "voluntary" posting of a notice, *e.g.*, on the entity's website as well as in "a prominent and conspicuous physical location . . . where notices to the public *and* notices to its workforce are customarily posted" informing employees of their right to refuse to participate in, refer for, or pay for health care services "that violate

your conscience, religious beliefs, or moral convictions" as "evidence" of an

entity's compliance with the Rule.  *Id.* at 23,270 (citing 45 C.F.R. § 88.5), 23,272

(to be codified at Appx. A to Part 88).  By contrast, HHS has suggested that

posting a notice designed to apprise patients of their right to health care

information or the possibility that their services might be limited by the personal

beliefs of their health care providers could *violate* the Rule.  *See id.* at 23,192.

112.   The Final Rule also purports to grant broad enforcement authority to

OCR, including the authority to initiate compliance reviews and conduct

investigations.  *Id.* at 23,271–72 (to be codified at 45 C.F.R. § 88.7).  HHS may

commence a compliance review or investigation of any entity if HHS "suspect[s],"

based on any source, noncompliance with the Final Rule or related statutes.  *Id.* at

23,271.  The Rule explicitly states that covered entities must provide HHS virtually

unlimited access to its books, records, accounts, facilities, and information upon

request, and without regard for privacy or confidentiality concerns.  *Id.* at 23,270–

71.

113.   If HHS determines that there has been a "failure to comply" with any

provision of the Final Rule or the statutes it purports to implement, the Rule

authorizes HHS to temporarily or permanently withhold, deny, suspend, terminate,

or claw back what may be billions of dollars in federal funds, including non-HHS-

appropriated or administered funds.  *Id.* at 23,271–72.  Such authority even extends

40

to termination of funding during the pendency of good-faith, voluntary compliance efforts. *Id.*

114.   As a general matter, the Rule does not require any nexus between the funding subject to termination and the alleged violation, nor does it specify procedures or factors for evaluating what sanction would be appropriate for a violation. *See id.* at 23,271–72.  This would appear to authorize HHS upon a finding of violation of the subsection (c)(1) of the Church Amendment, which is limited to PHSA funds, to revoke an entity's funding disbursed under any or *all* federal programs.

115.   Further, if HHS determines that an entity has failed to comply with any of these requirements, the entity must thereafter, in *any* application for new or renewed funding in the three years following, disclose that finding of noncompliance. *Id.* at 23,271.

116.   The Final Rule also states that grantees may be held liable, and therefore subject to all the penalties set forth above, for any violations of the Rule or the underlying statutes by a sub-recipient. *Id.* at 23,270–71.  This includes an obligation for entities to disclose noncompliance by sub-recipients in their own future funding applications. *Id.*

117.   This affects Plaintiffs in two distinct ways.  First, because some of Plaintiff NFPRHA's members (including Plaintiff PHS) delegate funds to sub-

recipients, under the Rule they are responsible not only for their own compliance but also for the compliance of their sub-recipients.  Second, because some of Plaintiff NFPRHA's members are sub-recipients of grantees, if another sub-recipient in the network is found to be out of compliance with the Rule and the grantee is penalized for it, the other sub-recipient(s) could also lose their funding through no fault of their own.

## The Final Rule's Failure to Comply with the APA

118.   As set forth above, the Final Rule is in excess of HHS's rulemaking authority; impermissibly expands the underlying federal refusal statutes beyond their plain meaning and congressional intent; and directly conflicts with numerous other federal laws, such as Title X, EMTALA, and Section 1554 of the PPACA.

119.   The Final Rule violates the APA in numerous other ways, as well.

120.   For example, HHS failed to respond to significant comments and otherwise failed to account for the Rule's devastating impact on patients and public health.  Despite numerous comments, including from leading medical organizations, describing the Rule's devastating impact on patients and public health, HHS refused to incorporate this critical information into its final analysis and decision to finalize the Rule.[22]  *See*, *e.g*., 84 Fed. Reg. at 23,252 (refusing to

---

[22] ACLU Comment at 4–6, 10–14; American Academy of Family Physicians Comment at 1; American Academy of Pharmacists Comment at 1–2; American Academy of Pediatrics Comment at 2–3; American College of Obstetricians and Gynecologists Comment at 1–2;

consider the Rule's impact on access to health care services because it could not quantify the expected impact).  HHS likewise failed to adequately address the impact the Rule—which is expressly designed to allow health care providers to withhold information from patients—would have on informed consent or the standard of care.[23]  Instead, HHS merely stated—without explanation or justification—that it did not believe informed consent would be impaired.  *Id.* at 23,189.

121.   In addition, HHS failed to justify its complete and sudden about-face from its position that the 2008 Rule—which purported to expand the meaning and scope of the federal refusal statutes in similar, if not identical, ways—undermined informed consent, *see* 76 Fed. Reg. at 9,973 (Feb. 23, 2011), reduced patient access to health care without a basis in the underlying statutes, *id*. at 9,974, and "created unnecessary additional financial and administrative burdens on health care entities," *id*.

---

American Hospital Association Comment at 3; American Medical Association Comment at 1–3, 6–7; City of New York Comment at 1–3; NFPRHA Comment at 5, 7–10; HIV Medical Association Comment at 1-2; National Association of County and City Health Officials Comment at 2; State Attorneys General Comment at 7–10, 18–20; State of Washington Comment at 2–3.

[23] American Academy of Pharmacists Comment at 2; American Academy of Pediatrics Comment at 2–3, 8–9; American College of Obstetricians and Gynecologists Comment at 1–2; American Medical Association Comment at 2; NFPRHA Comment at 5, 9–10; Wisconsin Medical Society Comment at 5; State Attorneys General Comment at 14–15; ACLU Comment at 8–9, 17–18.

122.   By the same token, HHS failed to justify the sudden reversal of agency position that "the Federal health care provider conscience statutes . . . will continue to protect health care providers" without the need for HHS rulemaking interpreting those statutes and that the existing complaint process within OCR "provides a clear process to enforce those laws." *Id.*

123.   To the contrary there is an utter lack of any evidence that the existing statutory framework, along with Title VII's requirement of reasonable accommodation of the religious and moral beliefs of all employees, are or ever have been insufficient to protect individuals in the health care context.

124.   Finally, HHS's regulatory impact analysis, which is required under Executive Order 12,866 because the Rule is a "significant regulatory action," impermissibly disregarded evidence of significant indirect and direct costs imposed by the Rule.  *See* Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Oct. 4, 1993).

125.   For example, the Rule utterly fails to account for the inevitable costs to already underserved patients (and their families) who are denied information about and/or access to health services, and the impact of the denial of such information and/or services, including in emergencies, on public health.  The Rule also fails to account for the inevitable costs to health care providers, including Plaintiffs, to come into compliance with the Rule (*e.g.*, the significant time, expenses, and other resources required to revise employment practices, manuals,

and handbooks; re-train staff with supervisory responsibilities on hiring and accommodation requests; review all job descriptions, applications, and other employment recruitment materials; and obtain legal advice to determine how the Rule interacts with existing state and federal legal obligations); the costs of hiring additional personnel while maintaining staff who refuse to perform basic job functions; and the inevitable costs stemming from a loss of services, good will, and reputation when patients are refused care. For Plaintiff NFPRHA's members who are also Title X grantees, the Final Rule also fails to account for the significant time, expenses, and resources required for their sub-recipients to also come into compliance with the Final Rule. Lastly, the Rule fails to account for the damage to the public safety net if longstanding, proven providers of federally-funded care (such as Plaintiffs) lose their funding and are unable to continue serving the millions of patients they have served for decades.

## **THE HARMS CAUSED BY ENFORCEMENT OF THE FINAL RULE**

126.   If allowed to take effect, the Final Rule will inflict immediate, significant and irreparable harm on millions of individuals who rely on federally funded health care each year by limiting access to services and burdening health care providers across the United States, such as Plaintiffs, who provide this care.

127.   The Rule will exacerbate existing systemic barriers by endangering Plaintiffs' members' ability to provide care to already underserved populations. For example:

- By requiring the absolute accommodation of an employee's refusal to provide certain information and services, the Final Rule could at any time force Plaintiffs to reduce the availability or scope of services they provide or even eliminate them entirely, particularly in small locations that may rely on a single staff member to perform multiple job functions.

- By prohibiting Plaintiffs from even asking job applicants whether they are willing to perform basic job requirements, and because the Final Rule does not require employees who intend to refuse to so notify their employers or their patients, neither Plaintiffs nor their patients may be aware when a staff member is denying a patient access to needed care or information;

- By prohibiting those of Plaintiff NFPRHA's members who are state and local governmental Title X grantees from requiring sub-recipients to comply with the statutory and regulatory requirements of Title X's abortion counseling and referral, the Final Rule will systematically undermine the integrity of the Title X program, further jeopardizing the

ability of Plaintiffs' patients to access necessary health care and make

voluntary, informed decisions about their reproductive health.

128.   For example, Plaintiff PHS is currently hiring for the position of a

nurse in one of its home health programs, and typically fills multiple clinical and

administrative positions each year.  If the Rule takes effect, as planned, Plaintiff

PHS will have no way to ensure it does not hire an applicant for its current open

position or any future such positions, who will actively withhold and obstruct their

patients' ability to obtain needed care and information, and refuse to perform

essential aspects of their job.

129.   In turn, the Rule's requirement that Plaintiffs hire and retain

employees that withhold critical information from patients, even without patients'

knowledge, will damage Plaintiffs' reputations as health care providers and cost

them good will from patients, potential patients, and damage their ability to obtain

funding from other sources.

130.   Moreover, in view of the Final Rule's unprecedented grant of

authority to OCR to investigate complaints and terminate federal funding based on

vague and arbitrary criteria, and the requirement that Plaintiffs maintain and allow

OCR access to "evidence" of compliance at all times, enforcement of the Rule will

also put Plaintiffs at immediate risk of losing millions of dollars in federal funding,

further threatening the health of the millions of patients who rely on them for their health care.

131.    The Rule will also inflict significant harm on Plaintiffs' patients by undermining the fundamental principles of informed consent.  In order for patients to provide informed consent a provider must disclose relevant and medically accurate information about all treatment choices and alternatives in a nondirective fashion so that patients can make voluntary and informed decisions about their medical treatment.[24] The failure to provide this information not only deprives patients of the ability to make informed decisions, but also can effectively result in a denial of care because if the patient does not know the option exists, they cannot seek the care elsewhere.  By permitting individual health care providers to withhold basic information about a patient's health care options, even in emergencies, the Final Rule contravenes these principles.

132.    These harms will not just be limited to patients seeking abortion and sterilization.  Though the underlying federal refusal statutes predominantly address abortion and/or sterilization, they are not exclusively limited to those services.  For example, subsections (c)(2) and (d) of the Church Amendments permit employees of certain covered entities to refuse to perform or assist in the performance of "any

---

[24] ACLU Comment at 17–18; American Academy of Pediatrics Comment at 2–3; American College of Obstetricians and Gynecologists Comment at 2; American Medical Association Comment at 2; NFPRHA Comment at 9–10; State Attorneys General Comment at 14–15.

lawful health service" or "any part of a health service program." This could include, but certainly is not limited to, other health care services such as the provision of contraceptive and contraceptive counseling, transition-related health care, HIV testing and counseling, end-of-life care, assisted reproductive technology and fertility treatments, post-sexual assault care, and mental health care.

133. Moreover, even though the Final Rule does not purport to redefine abortion to include contraception, it is nonetheless foreseeable that individuals may attempt to invoke the protections of the underlying federal refusal statutes that deal with abortion to refuse to provide contraception based on their religious belief that certain forms of contraception are "abortifacients." Rather than prevent such further misuse of the federal refusal statutes, the Final Rule appears to encourage it. *See, e.g.*, 84 Fed. Reg. at 23,178 (citing approvingly to a lawsuit brought by a nurse alleging she was not hired because she refused to prescribe hormonal contraceptives, which she believed to be "abortifacients").

134. Individuals who already face severe challenges in accessing care, including women—particularly Black women and other women of color—LGBT patients, immigrants and people with limited English proficiency, patients in rural areas, and people with disabilities, stand to suffer the greatest harms from the Final Rule.

135.   Title X projects, such as Plaintiff NFPRHA's members, serve racially and ethnically diverse populations, including a disproportionately high percentage of Black and Latina clients.  According to 2017 data from the federal government, 22% of Title X patients self-identified as Black or African American and 33% as Hispanic or Latino/a, compared to 12% and 18% of the nation, respectively. Fourteen percent of 2017 users reported having limited English proficiency.[25]

136.   This is certainly true of Plaintiff PHS:  In 2017, 40% of PHS's Title X clients identified as Black or African American, compared to 26% of New York City's population; while 42% identified as Hispanic or Latino/a, compared to 29% of the City's population.  A total of 15% of PHS's clients had limited English proficiency.

137.   Women, particularly Black women and other women of color, historically have been subject to discrimination in health care and are still far more likely to face barriers to access, including discriminatory treatment by health care providers.[26]  For example, research shows that, in many states, women of color disproportionately receive their care at Catholic hospitals, institutions which have a

---

[25] Office of Population Affairs, *Title X Family Planning Annual Report: 2017 National Summary*, U.S. Dep't of Health & Human Services (Aug. 2018), https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2017-national-summary.pdf.

[26] *See*, *e.g.*, National Women's Law Center, Comment Letter on Proposed Rule Protecting Statutory Conscience Rights in Health Care at 10–11, (Mar. 27, 2018), https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71477.

history of denying emergency abortion care.[27]  The Final Rule will only erect further barriers to care by empowering more hospitals and hospital employees to withhold information from pregnant patients, even in emergencies, and by impeding the ability of state and federal governments to enforce EMTALA and similar state laws.

138.   LGBT patients also face substantial barriers to routine care and risk of discrimination.  For example, nearly one in five LGBT people, including 31% of transgender people, said that it would be very difficult or impossible to get the health care they need at another hospital if they were turned away.[28]  Yet the Final Rule's broad definitions of "discrimination" and "assist in the performance," for purposes of the Church Amendments, provide hospital employees with virtually limitless ability to refuse to take any action with an "articulable" connection to a sterilization procedure, which is how certain gender-affirming surgeries are categorized by certain health care providers.  The Final Rule's other broad definitions could increase these barriers by inviting providers to refuse to provide care because of their gender identity or sexual orientation of a patient, in direct

---

[27] ACLU Comment, at 12; Alliance State Advocates for Women's Rights and Gender Equality, Comment Letter on Proposed Rule Protecting Statutory Conscience Rights in Health Care (hereinafter "Alliance Comment"), (Mar. 27, 2018), https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71601.

[28] National Coalition for LGBTQ Health, Comment Letter on Proposed Rule Protecting Statutory Conscience Rights in Health Care, at 2 (Mar. 27, 2018), https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71195.

contravention of other federal protections, such as Section 1557 of the Affordable Care Act.  *See* 42 U.S.C. § 18116.

139.   For patients in rural areas, the denial of care may likewise leave patients with no other options.  Once again, these harms would fall most harshly on people of color in rural America, who are most likely to live in an areas designated as having a profound shortage of health professionals.[29]  This problem is "particularly acute for immigrant, Latina women and their families who often face cultural and linguistic barriers to care, especially in rural areas."[30]  These women "often lack access to transportation and may have to travel great distances to get the care they need."[31]  If these women encounter the health care refusals sanctioned by the Final Rule they will often "have nowhere else to go."[32]

140.   Moreover, because people with disabilities as a group are subject to higher unemployment and lower socio-economic status they may be more likely to rely on federally funded care.[33]  Yet, under the Final Rule, the federally funded

---

[29] *See, e.g.*, Alliance Comment, at 3.

[30] National Immigration Law Center Comment Letter on Proposed Rule Protecting Statutory Conscience Rights in Health Care, at 4 (Mar. 27, 2018), https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71248.

[31] *Id.* at 4–5.

[32] *Id.* at 5.

[33] Disability Rights Education and Defense Fund, Comment Letter on Proposed Rule Protecting Statutory Conscience Rights in Health Care, at 2, (Mar 27, 2018), https://www.regulations.gov/document?D=HHS-OCR-2018-0002-11375.

service providers upon whom people with disabilities rely to coordinate necessary services or to provide transportation or other key services through Medicaid or Medicare could invoke the Final Rule to refuse to, *e.g.*, set up an appointment for pregnancy options counseling or provide necessary services such as sign-language interpretation when an individual with disabilities is seeking emergency contraception.

141.   To the extent the Rule impedes state and local governments' attempts to enforce laws protecting access to care and preventing discrimination against patients, these harms will only be magnified.  For example, like many other states and the federal government, New York requires the provision of emergency and medically necessary care.  *See* N.Y. Pub. Health Law § 2805-b.  Like other states, New York also prohibits health care professionals from abandoning a patient in need, *see* 8 NYCRR § 29.2(a)(1), and protects patients' right to informed consent, *see* N.Y. Pub. Health L. § 2805-d.

142.   For all these reasons, which are illustrative but by no means an exclusive accounting of the harms imposed by the Rule, the Final Rule will inflict immediate, significant, and irreparable injury on Plaintiffs and their patients for which there is no adequate remedy at law.

## CAUSES OF ACTION

### COUNT I
### The Rule Exceeds Statutory Authority
### (Administrative Procedure Act, 5 U.S.C. § 706(2)(C))

143.   The allegations of paragraphs 1 through 142 are incorporated as though fully set forth herein.

144.   The Final Rule is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," in violation of the APA, 5 U.S.C. § 706(2)(C), because, *inter alia*, the underlying laws—the Church, Coats-Snowe, and Weldon Amendments—do not delegate authority to HHS to promulgate force of law regulations interpreting those statutes.

145.   Moreover, none of the statutory authorities upon which the Rule relies delegate or otherwise establish the broad enforcement authority that HHS creates and claims for itself in the Final Rule, including the authority to terminate federal financial assistance to entities found to be in violation of the Rule.  *See* 84 Fed. Reg. at 23,221 (to be codified at 45 C.F.R. § 88.7(i)(3)(iv)).

### COUNT II
### The Rule Is Not in Accordance with Law
### (Administrative Procedure Act, 5 U.S.C. § 706(2)(A))

146.   The allegations of paragraphs 1 through 142 are incorporated as though fully set forth herein.

147.    The Final Rule is contrary to law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), for the following reasons, among others.

148.    The Final Rule impermissibly and dramatically expands the set of individuals and entities who can claim protections and broadens what can be refused under the Church, Weldon, and Coats-Snowe Amendments by defining terms including but not limited to "discriminate" and "discrimination," "assist in the performance," and "referral" contrary to their plain meaning and Congressional intent.  84. Fed. Reg. 23,263–64 (to be codified at 45 C.F.R. § 88.2).

149.    The Final Rule conflicts with and is not in accordance with the terms and purpose of Title X because it contravenes the statutory requirement that all pregnancy counseling provided in the Title X program be nondirective, *see* HHS Appropriations Act, 2019, Pub. L. No. 115-245, 132 Stat. 2981, 3070–71 (2018), by requiring Title X providers (including Plaintiffs) to permit their employees to withhold and obstruct access to information about abortion and requiring Title X grantees (including Plaintiffs) to permit their sub-recipients to do the same.

150.    The Final Rule conflicts with and is not in accordance with the Coats-Snowe Amendment because it vastly expands the statute's scope beyond what Congress intended, which was to establish a limited right to refuse to participate in or provide abortion training.  *See supra* ¶¶ 55– 59.

151.   The Final Rule contains no emergency exception and therefore conflicts with and is not in accordance with EMTALA, which requires covered hospitals—including public, private, and religiously affiliated hospitals—to provide an appropriate medical screening to any patient requesting treatment, to determine whether an emergency medical condition exists, and either to stabilize the condition or to transfer the patient if medically indicated to another facility.  42 U.S.C. § 1395dd(a)–(c).

152.   The Final Rule purports to authorize health care workers to restrict access to health services and withhold medical information and therefore conflicts with and is not in accordance with Section 1554 of the PPACA, which prohibits HHS from promulgating any regulation that "(1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care; (2) impedes timely access to health care services; (3) interferes with communications regarding a full range of treatment options between the patient and the provider; (4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions; (5) violates the principles of informed consent and the ethical standards of health care professionals; or (6) limits the availability of health care treatment for the full duration of a patient's medical needs." *Id.* § 18114.

## COUNT III
### The Rule is Contrary to Constitutional Right
### (Administrative Procedure Act, 5 U.S.C. § 706(2)(B))

153.   The allegations of paragraphs 1 through 142 are incorporated as though fully set forth herein.

154.   The Final Rule conflicts with the First and Fifth Amendments of the U.S. Constitution in violation of APA, 5 U.S.C. § 706(2)(B), for the following reasons.

155.   By imposing on Plaintiffs a categorical requirement to accommodate employees' religious objections to providing health care services—regardless of the impact on their business, other employees, or patients—the Rule violates the Establishment Clause of the First Amendment of the United States Constitution by impermissibly advancing religious beliefs at the expense of third parties and having the primary purpose and effect of promoting and endorsing religious beliefs.

156.    By failing to provide adequate guidance about what conduct is prohibited and by encouraging arbitrary enforcement, the Final Rule is void for vagueness and violates Plaintiffs' rights to due process guaranteed by the Fifth Amendment of the United States Constitution.

157.   By interfering with women's ability to obtain abortions necessary to preserve their health or life, the Final Rule violates Plaintiffs' patients' rights to

privacy and liberty guaranteed by the Fifth Amendment of the United States

Constitution.

## COUNT IV
### The Rule is Arbitrary, Capricious, and an Abuse of Discretion
### (Administrative Procedure Act, 5 U.S.C. § 706(2)(A))

158.   The allegations of paragraphs 1 through 142 are incorporated as

though fully set forth herein.

159.   The Final Rule is arbitrary, capricious, and an abuse of discretion in

violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) for the

following reasons, among others.

160.   HHS failed to adequately consider important aspects of the problem,

including the Rule's harmful effects on patient health, informed consent, standards

of care, the patient-provider relationship, and burdens on providers, as well as

damage to the integrity of the Title X program.  In addition to failing to adequately

consider these harms, HHS failed to adequately consider the tremendous

compliance-related burdens and costs the Final Rule will impose on Plaintiffs.

161.   HHS failed to adequately address and resolve the Rule's conflicts and

interactions with the U.S. Constitution and numerous federal laws, including Title

X, EMTALA, and Sections 1554 and 1557 of the PPACA, and Title VII.

162.   The Final Rule is a back-door attempt to undo HHS's own Title X

regulations, which require abortion referrals to be provided to patients upon

request, *see* 65 Fed. Reg. 41,270, 41,279 (2000) (codified at 42 C.F.R. §
59.5(a)(5)), without specific notice and comment rulemaking.

163.   HHS failed to clarify a number of vague terms and requirements the
violation of which could cause covered entities to lose federal funding.  These
vague provisions include, *inter alia*: whether Plaintiffs are obligated to hire
individuals who refuse to perform "the primary or substantial majority of the duties
of the position," 84 Fed. Reg. at 23,192; what constitutes a "persuasive
justification" for inquiring more than once per calendar year whether an employee
intends to refuse to perform aspects of their job, *id.* at 23,263 (to be codified at 45
C.F.R. § 88.2); and when informing patients that certain staff refuse to provide
certain information and services constitutes "retaliation," *id.* at 23,192.

164.   HHS failed to provide a reasoned explanation for its reversal of
longstanding policy concerning the scope of the federal refusal statutes, HHS's
authority to implement regulations interpreting those statutes, and the reasoned
conclusions set forth in the 2011 Rule.

165.   HHS failed to demonstrate that existing legal protections—including
the underlying federal refusal statutes, the existing administrative complaint
mechanism within OCR, and Title VII—are insufficient to protect health care
providers' religious and moral beliefs.

166.   HHS failed to conduct an adequate regulatory impact analysis reflecting the considerable costs to patients and providers as evinced by the rulemaking record, pursuant to Executive Order 12,866, 58 Fed. Reg. 51,735, and instructions from both the Office of Management and Budget's Circular A-4 on Regulatory Analysis (2003) and HHS's own Guidelines for Regulatory Impact Analysis (2016), which detail best practices for assessing costs and benefits under regulatory impact analyses and require that agencies account for and quantify direct and indirect health costs to the fullest extent practicable.

167.   HHS failed to respond to significant comments from  leading medical associations, health care providers, and current and former government officials, regarding, *inter alia*, the Rule's: detrimental impact on health care access; exacerbation of existing health care inequities and barriers to access; burdens on health care providers like Plaintiffs; interference with the patient-provider relationship, including informed consent; and the vague, broad, and overly punitive enforcement authority assumed by HHS.

**<u>COUNT V</u>**
**The Rule Was Promulgated Without Observance of Required Procedure**
**(Administrative Procedure Act, 5 U.S.C. § 706(2)(D))**

168.   The allegations of paragraphs 1 through 142 are incorporated as though fully set forth herein.

169.   HHS promulgated the Rule without fidelity to procedures required by

the Administrative Procedure Act, 5 U.S.C. § 706(2)(D), because, among other reasons, the Final Rule is not a "logical outgrowth" of the Proposed Rule as regards the definition of "discrimination."  *See Nat'l Black Media Coal. v. FCC*, 791 F.2d 1016, 1022 (2d Cir. 1986).

170.   Agencies must describe "with reasonable specificity" any proposed changes to a regulation because a "[g]eneral notice that a new standard will be adopted" violates the notice-and-comment requirements of the APA.  *Time Warner Cable Inc. v. FCC*, 729 F.3d 137, 170 (2d Cir. 2013).  Because of this procedural defect, commenters, including Plaintiffs, were deprived of the opportunity to weigh in on this definition.

## PRAYER FOR RELIEF

Plaintiffs pray that this Court:

A.    Issue preliminary and permanent injunctive relief, without bond, restraining Defendants, their agents, employees, appointees, and/or successors from enforcing, threatening to enforce, or otherwise applying the provisions of the Final Rule;

B.    Enter judgment declaring the Final Rule is invalid;

C.    Set aside and vacate the Final Rule;

D.    Award Plaintiffs attorney's fees, costs, and expenses and any interest allowable by law under 28 U.S.C. § 2412; and

E.      Grant such other and further relief that this Court deems just and appropriate.


Dated: June 11, 2019                    /s/Alexa Kolbi-Molinas
                                        Alexa Kolbi-Molinas
                                        Lindsey Kaley*
                                        Elizabeth Deutsch*
                                        Brigitte Amiri
                                        American Civil Liberties Union
                                        Foundation
                                        125 Broad Street, 18th Floor
                                        New York, NY 10004
                                        Phone: (212) 549-2633
                                        Fax: (212) 549-2652
                                        akolbi-molinas@aclu.org
                                        lkaley@aclu.org
                                        edeutsch@aclu.org
                                        bamiri@aclu.org

                                        Elizabeth O. Gill**
                                        American Civil Liberties Union
                                        Foundation of Northern California, Inc.
                                        39 Drumm Street
                                        San Francisco, CA 94111
                                        Phone: (415) 621-2493
                                        Fax: (415) 255-8437
                                        egill@aclunc.org

                                        Daniel Mach**
                                        American Civil Liberties Union
                                        Foundation
                                        915 15th Street NW
                                        Washington, DC 20005
                                        Phone: (202) 675-2330
                                        Fax: (202) 546-0738
                                        dmach@aclu.org

Christopher Dunn
Erin Beth Harrist
Donna Lieberman
New York Civil Liberties Union
Foundation
125 Broad Street, 19th Floor
New York, NY 10004
Phone: (212) 607-2298
cdunn@nyclu.org
eharrist@nyclu.org
dlieberman@nyclu.org

*Attorneys for Plaintiffs*

* Application for admission forthcoming
**Pro hac vice* motion forthcoming