# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL FAMILY PLANNING AND REPRODUCTIVE HEALTH ASSOCIATION; and PUBLIC HEALTH SOLUTIONS, <br><br>          Plaintiffs, <br><br>    v. <br><br> ALEX M. AZAR II, in his official capacity as Secretary of the U.S. Department of Health and Human Services; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROGER SEVERINO, in his official capacity as Director of the Office for Civil Rights of the U.S. Department of Health and Human Services; OFFICE FOR CIVIL RIGHTS of the U.S. Department of Health and Human Services, <br><br>          Defendants. | Civil Action No.: 1:19-cv-05435 <br><br> (rel: 1:19-cv-04676-PAE; 1:19-cv-05433-PAE) |

**<u>DECLARATION OF LISA DAVID</u>**

Lisa David declares and states as follows:

    1.    I am the President and Chief Executive Officer at Public Health Solutions ("PHS").  PHS is a not-for-profit corporation organized under the laws of New York, headquartered at 40 Worth St, New York, NY 10013.  I have been the President and Chief Executive Officer of PHS since 2015.

    2.    I have more than three decades experience working in the health services field, including in the areas of hospital administration and direct services management.  At PHS and throughout my career, I have been responsible for managing nonprofit public health care institutions' budgets, compliance and quality management, recruitment, and general operations.

1

I work closely with PHS's Program Directors to track, assess, and strategize ways to improve the performance of our programing, as well as managing our finances.

3.      PHS was first established in 1957 and is currently the largest public health nonprofit serving New York City.  PHS was originally created as part of the New York City Department of Health and Mental Hygiene ("DOHMH"), and though we are no longer part of a city agency, we continue to have a robust, long-standing partnership with the New York City and State governments.  Our work reaches clients in all five boroughs, as well as in Nassau, Suffolk, Putnam, Westchester, and Rockland Counties.  Notably, our sexual and reproductive health centers have been providing comprehensive, community-based family planning services (and related health care) to Brooklyn for over 50 years, resulting in a stable and trusted presence in their communities.

4.      As an organization, PHS is dedicated to developing, implementing, and advocating for dynamic solutions to prevent disease and improve community health.  PHS has been a leader in addressing crucial public health issues, including food and nutrition, health insurance access, maternal and child health, reproductive health, tobacco control, and HIV/AIDS prevention.  Our programs have a strong focus on health disparities to ensure New York City families have the basics for a healthier life.  As a Title X grantee, we are also a proud member of Plaintiff National Family Planning and Reproductive Health Association.

5.      PHS employs approximately 415 individuals, including full-time staff, part-time staff, and contract workers.  In addition, interns, volunteers, and contractors support us in caring for our clients and their communities.

6.      I have read the Department of Health and Human Services' ("HHS") final rule (the "Rule") at issue in this case and understand that, unless it is blocked by a court, it will take

effect on July 22, 2019.  Because I believe the Rule will immediately impede our efforts to achieve our goals, jeopardize the health and well-being of our patients, and will harm PHS's longstanding reputation in the community as a trusted provider of patient-centered, compassionate, high-quality health care, I submit this declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

### PHS'S FEDERAL FUNDS AT RISK BY THE RULE

7.      Federal funds account for almost all of the money that PHS uses to provide family planning services either directly or through agencies with which it contracts.

8.      PHS is New York City's largest grantee for the Title X[1] program—the federal government's only funding stream dedicated exclusively to family planning services—and has successfully competed for Title X grant funds for 36 years.  PHS was most recently awarded a $4.6 million Title X grant, approximately 86% of which ($3.9 million) is dispersed to five delegate agencies (known as "sub-recipients"), as well as PHS's own two sexual and reproductive health centers, to provide family planning services to low-income and uninsured New Yorkers.  PHS is also a sub-recipient of the New York State Department of Health's ("DOH") Title X grant, through which it receives additional Title X funding for its two health centers.

9.      PHS and its sub-recipients rely on Title X funding to deliver family planning services.  Title X funding constitutes approximately two-thirds of PHS's total family planning program revenue.  This funding supports the provision of comprehensive sexual and reproductive health services, including clinical and support staff salaries and maintaining the health centers, as well as the procurement of contraceptives to increase same-day access to

---

[1] Title X refers to Title X of the Public Health Services Act ("PHSA").  42 U.S.C. § 300(a).

methods that are more expensive for health centers to routinely stock, such as long-acting reversible contraceptives.

10.     PHS and its sub-recipients are also reimbursed through the federal Medicaid program for services provided to eligible patients, including for family planning services and prenatal care.  Medicaid reimbursement comprises 99% of PHS's non-grant patient service revenue.

11.     PHS is the lead agency for the Healthy Start Program, an HHS project funded under the PHSA, which is a partnership through which pregnant people and children up to age two are referred for services to strengthen family resilience.

12.     PHS receives over $25 million in grant funding from HHS for the Hospital Preparedness Program and Public Health Emergency Preparedness Cooperative Agreements. Through these programs, PHS supports hospitals and community-based organizations in developing and maintaining disaster plans for public health emergencies.

13.     As a longstanding partner with the New York City government, PHS is also the administrator for a substantial amount of federal grant funding that the City receives, meaning PHS is responsible for re-granting that funding to other organizations.  PHS administers the NYC DOHMH's $140 million grant from the Centers for Disease Control and Prevention to do HIV prevention work, as well as to train people to do that work.  PHS is also the administrator for $125 million in grant funding from the Ryan White HIV/AIDS Program administered by HHS, which PHS re-grants on behalf of the NYC DOHMH as well as Rockland, Putnam, and Westchester Counties.  Administering these grants strengthens PHS's already deep roots in the community through its work with over 200 local community organizations that receive the funding.

14.     In total, PHS receives $182 million in funds that originate from the federal government—$138 million of which originates from HHS, with PHS receiving $31.4 million of those funds directly from HHS—all of which could be at risk if PHS is found to be out of compliance with the Rule.

15.     As President and Chief Executive Officer, I am responsible for ensuring that our clinical locations and sub-recipients provide their clients with the full range of services required by the federal law governing these funding streams.  For example, the Title X program requires PHS and its sub-recipients to provide clients with a broad range of effective, medically-approved family planning methods and services (such as comprehensive reproductive health exams, STD and HIV testing and treatment, and pregnancy testing); to provide services while respecting our clients dignity, and without subjecting them to any coercion; and to offer non-directive options counseling to pregnant people, including regarding prenatal care and delivery, infant care, adoption, and abortion.  All PHS and sub-recipient facilities offer a broad range of medically approved family planning methods either on site or by referral.

16.     Additionally, I am responsible for ensuring, along with PHS's Program Directors, that our services are meeting all applicable standards of care, including ensuring that patients provide informed consent.  The AMA's Code of Medical Ethics explains that patients have a right to make voluntary, well-considered decisions about their care, and so health care providers must inform their patients about all relevant options for treatment in order to abide by the principles of informed consent.

17.     To ensure compliance with state and federal standards and guidelines, PHS puts its sub-recipients through a rigorous application process.  In addition, PHS employs an extensive quality-monitoring program for both its own sites and its sub-recipients.  PHS conducts a

comprehensive monthly review of its own health centers' quality data, and reviews reports from

sub-recipients on a quarterly basis, in addition to regular monitoring visits, internal reviews of

policies and procedures, and interviews of staff and clients.  We also closely monitor,

investigate, and respond to all clients' complaints.

## PHS'S HEALTH SERVICES

18.     PHS addresses critical public health issues through a client-centered approach,

which is at the core of our mission.  In 2018, PHS served 105,000 individuals and families across

New York City through our various direct services programs.

19.     The services offered by our centers include: affordable, comprehensive, and

confidential reproductive healthcare for adults and adolescents; services to support pregnant and

parenting families, including one-on-one health care and education in the home as well as group

support during pregnancy and early childhood; health insurance enrollment; and food benefits

assistance, among other innovative public health programs and initiatives.  Part of PHS's

strength is our demonstrated ability to cross-refer clients to other PHS programs for a continuum

of critical services, and to that end, some of the programs are even located together.  For

example, our sexual and reproductive health centers have on-site health insurance enrollment

services, and frequently refer patients to our home-visit health care programs.  Our

Neighborhood Women Infants and Children ("WIC") program centers regularly refer clients to

our programs for health insurance enrollment and food benefits assistance, both of which are

located at the same site.

20.     With respect to reproductive health care, PHS and its sub-recipients provide

prenatal and family planning services to over 40,000 at-risk patients annually throughout New

York City.  As noted above, in addition to the provision of most available birth control methods

on-site (including long-acting reversible contraceptives and emergency contraception), Title X-funded services at our two health centers include free walk-in pregnancy testing; gynecological exams; men's sexual healthcare; teens' sexual healthcare; STD and HIV testing, treatment, and counseling; mental health services; and health education.  We also provide additional services at our health centers, such as prenatal care and HIV prevention through HIV Pre-Exposure Prophylaxis, with non-Title X funds.

21.     At all of our health centers, patients with a positive pregnancy test who receive counseling are offered neutral, nondirective counseling on all pregnancy options—including adoption, continuation of the pregnancy, and abortion—and referrals for medical care outside of the program are made as requested.  This is not only required by federal law, but fundamental principles of medical ethics and informed consent.  All counseling is provided in a patient-centered approach and is guided by the specific needs, values, and requests of the patients.

22.     Our client population for family planning services is diverse:  We see people of all races and ethnic groups.  In 2017, 40% of PHS's Title X clients identified as Black or African American, compared to 26% of New York City's population, while 42% identified as Hispanic or Latino/a, compared to 29% of the City's population.  We serve teenagers and adults; people who have children, or plan for children, or do not want to be parents.  Our patients are married and unmarried; lesbian, gay, bisexual, transgender, and queer ("LGBTQ") individuals; and a significant portion are immigrants.  A total of 15% of the clients had limited English proficiency.

23.     We serve predominantly low-income, high-risk patients who are dependent on publicly subsidized health facilities to obtain basic—but critical—medical care.  Approximately 70% of PHS patients are 100% below the poverty level, 76% are 200% below the poverty level,

and 26% lack health insurance.[2]  Nearly all of our patients rely on Medicaid.  The overwhelming majority of our family planning patients reside in medically underserved areas where reproductive health services are not easily accessed.  Without publicly funded health care, our patients would likely receive no preventative care at all.

24.     I know from my experience in the family planning field that the availability of pregnancy counseling, including information and referrals for abortion, is essential to the ability of our patients and their families to take control of their lives and do the best they can to create the futures they want for themselves and their children.  Some of our clients tell us that they are doing everything possible to provide for their children and know that they cannot afford to expand their families.  Other clients share that they are working their way through college or have just secured employment and that early parenthood (or another child) would derail their plans for education or work.  We care for clients who are in abusive relationships for whom pregnancy can put them at grave risk both because abuse often increases during pregnancy and because having a child makes it much more difficult for a person to eventually escape from an abusive relationship.  For these patients, access to contraception and abortion can be a matter of survival.  For our clients who have recently given birth, it is important for their own health and for healthy birth outcomes that they not become pregnant again until their bodies have recovered. Finally, some of our clients do not want children, but without birth control and referrals to abortion care, they are unable to exercise autonomy and self-determination.  For all of these clients, and others, the family planning services we provide are critical.

---

[2] In 2019, the FPL for a single person is $12,490 and $ 25,750 for a family of four in the 48 contiguous states and District of Columbia. HHS, Office of the Secretary, *Annual Update of the HHS Poverty Guidelines*, 84 FR 1167 (February 1, 2019).  In 2019, 200% of the FPL for a single person in the 48 contiguous states and District of Columbia was $24,980 per year, and $51,500 for a family of four.

### THE RULE WILL INFLICT IMMEDIATE AND IRREPARALE HARM
### ON PHS AND ITS PATIENTS

25.     I am very concerned that if the Rule takes effect, it will immediately prevent us from ensuring that our patients continue to receive the services they need in a safe, timely fashion—or at all.  In addition, I fear that because the Rule prevents us from guaranteeing that our patients continue to receive the services we are obligated by federal law to provide, we may be forced to reduce or discontinue these essential reproductive health services.

26.     Moreover, while PHS has always, to the best of my knowledge, complied with *all* federal laws and guidelines, I am very concerned that, because the Rule is in places vague and in other places appears to be inconsistent with existing legal requirements, the Rule places PHS at serious risk of losing its $138 million in federal funds administered by HHS.  And, as I explain further below, if PHS lost its federal funding it would be devastating; we would have to close the doors on our two sexual and reproductive health centers instantly, leaving our patients to try to find other health care providers that provide free or low-cost high quality care.  At a minimum, the health centers' 38 employees would be laid off.  Additionally, losing our funding stream would impact our sub-recipients, putting their programing, employees, and clients at risk as well.

### *The Rule's Impact on PHS's Healthcare Delivery Model*

27.     It is critical to PHS's philosophy of care that we deliver all of our services in a compassionate and nonjudgmental way.  For this reason, we work hard to recruit and hire people who are qualified and willing to provide the full range of services to all of our clients.  During the hiring process, we inform all applicants of the nature of PHS's work, making sure to describe all of our programs and scope of services, including that we provide emergency contraception as well as counseling and referral for abortion care.  We explain that we offer the same, comprehensive, high quality care to all patients, including to LGBTQ individuals, clients who

9

are sexually active outside of marriage, and to other members of our diverse client base.

28.     No matter what specific position applicants have applied for within our health services programs, we ask whether they are willing and able to participate in providing all of our services to all of our clients.  We do that because our employees of necessity work as a team, performing work beyond the specifics of their more individualized position titles.  Experience teaches that clients rarely compartmentalize their lives to match our different program areas, but rather have a variety of interconnected needs.  For example, a client who comes to our maternal and child health programs might reveal that she is pregnant and wants an abortion.  Or an adolescent seeking sexual health education might reveal that he is in a same-sex relationship and wants testing and preventative treatment for HIV.

29.     Over the years we have identified numerous job applicants who, once they learned more about PHS, have said that they would not be able to provide all of our services in a non-judgmental manner as required by the job, or would not be able to care for one or more of the populations we serve.  PHS does not make decisions about job applicants based on their personal beliefs or presume that applicants of any given religious background would be less qualified or unwilling to perform a job at PHS.  Rather, PHS relies on the applicants' self-identified limitations in their ability and willingness to perform all required aspects of the job.

30.     However, the Rule completely eliminates our ability to strike the appropriate balance between individual staff member's objections and our patients' needs.  For example, as I understand it, the Rule prohibits us from even asking job applicants whether they are willing to provide information about and referrals for abortion to patients who request it, or take any other action that has a "specific, reasonable, and articulable connection" to "furthering" an abortion.  Yet PHS fills several positions each year for health care providers who conduct home visits, and

about six sexual and reproductive health providers (including doctors, nurses, social workers, and health educators).  This does not even include hiring for other administrative staff positions that do not directly provide medical care or counseling, but who work with clinical staff to assist the provision of medical care and counseling.

31.     Given that, under the Rule, the requirement to accommodate existing employees' refusals to provide certain care appears absolute, PHS would want to be even more careful about whom it hires when replacing existing positions—particularly nurses and social workers—but the Rule expressly forbids this.  For example, there is a current opening for a nurse in one of our home health programs.  PHS staff are currently reviewing applications for the position, and at this stage in the process, are assessing whether applicants are comfortable with providing all services required as part of our home-visiting model.  If the Rule goes into effect, we will need to make changes to our hiring procedures in the middle of the process, resulting in delays in filling the position and uncertainty as to whether the candidates will provide the broad range of care required by the program.  What if a patient reveals to this nurse during a home visit that she had unprotected sex and wants a pregnancy test and to discuss her options?  When clients trust their PHS provider enough to reveal these confidences, we know that we are doing our job. Therefore, all of our employees must be able to connect clients to the services they need, whether by providing them with emergency contraception or pregnancy options counseling, or referring them for testing for STDs or for abortion care.  It would turn our healthcare delivery model on its head if, following the client's disclosure, the PHS nurse refused to provide the care, information, counseling, or referrals the client needed.  Not only would we not be providing the client with what they require, we would be passing judgment on them, thereby shutting down future communication between the client and our staff—if that client returns to us for care at all. Thus,

if the Rule takes effect, I am extremely concerned that PHS will now have no way of knowing if

we have hired a candidate who would not help a client needing non-directive pregnancy options

counseling or reproductive family planning, even though that is a key component of our service

to those clients.

33.     Of course, when objections to participating or assisting in the participation of any

health care service do arise we have always strived to accommodate our staff members'

objections.  But our success in doing so has turned on having the flexibility to balance the needs

of our patients with the individual beliefs of our staff.  Where possible we have transferred

duties, re-assigned staff, or otherwise accommodated the staff member's objection.

33.     But under the Rule, we can only ask an employee if they object to performing one

of their core job functions *after* we have hired them—and even then we can only ask once a year,

unless there is persuasive justification to do so more often, but the Rule does not explain what

meets that threshold. The employee, however, is under no obligation to inform us of any

objections at any time.  It could be weeks or months, if at all, before we ever find out that one of

our employees is withholding care from our patients.  From PHS's point of view, any amount of

time where patients are not receiving complete counseling and evidence-based care is too long;

when questions about abortion or other treatment do arise, it is at the very heart of our mission to

provide comprehensive and accurate information in a non-judgmental manner.  Our reputation

depends on our non-judgmental approach and we believe it's why our clients stay with us for

years and years and refer their friends and family to us as well.

34.     Moreover, assuming we are aware of any such objections, the Rule appears to

impose on PHS a categorical obligation to accommodate any employee's objection to, for

instance, providing information or referrals relating to abortion or sterilization, even in an

emergency, regardless of the impact on patient and public health. In particular, I understand the Rule would eliminate any flexibility we once had to transfer duties or reassign staff. Our only option under the Rule would be to offer the objecting employee a "voluntarily acceptable" accommodation, whatever that may be.

35.     I know for a fact that the total lack of flexibility under the Rule could be a problem at some of our clinical locations. For example, it is my understanding that before I started at PHS, our health centers were providing medication abortion for a period of time, and some of the nurses objected to being involved in the service. However, PHS staff were able to have conversations with those nurses about their concerns, conduct trainings to educate staff about medication abortion, and limit the provision of medication abortion to clinicians who did not object to medication abortion. Under the Rule, it is unclear whether it would be permissible for us to take any or all of these actions. Would the discussions and training with staff be considered "retaliation" or an "adverse action"? We have no way of knowing, and yet the consequences of being found to be out of compliance with the Rule could be devastating.

36.     Currently, we employ only five medical providers (one doctor, three nurse practitioners, and one certified nurse midwife), three licensed practical nurses, and two social workers who are expected to cycle through our two clinical health centers in Brooklyn. The center in the Eastern Parkway neighborhood of Brooklyn has, at times, only one medical provider on hand to treat patients. Thus, if the medical providers, nurses, or social workers at any of these sites refused to provide non-directive options counseling, including information about abortion, we could not continue to provide these services.

37.     This is so for several reasons. First, we do not have the funding to hire any additional staff at these sites. Each of our grant programs is very restrictive in how the funding

can be used, so the funds are not fungible across programs (and that assumes there would be a surplus that could be used to subsidize another program, when in fact our grant funding already does not cover the full cost of providing services).  Second, we do not have another program that employs doctors, so we could not simply reassign them (putting aside whether that would constitute discrimination under the Rule).  Third, we are required by both state and federal law to provide options counseling and referrals for abortion to all our patients, so, based on our funding and staffing limitations, there is no role at the health centers that would allow a clinician to avoid mention of abortion entirely.  We practice non-judgmental and non-coercive counseling to satisfy our ethical obligations and good medical practices as health care providers.  Such counseling should be based on the requests and situation of the patient, otherwise it risks imposing the provider's values on patients and undermining provider-patient relationships.

38.    Nor could we transfer a client from staff person to staff person in the middle of a counseling session.  For example, if a staff person were willing to discuss two but not all three pregnancy options with a client—that is, if a counselor were willing to discuss with a pregnant client her option to carry the pregnancy to term and raise a child and her option to carry the pregnancy to term and place the baby for adoption, but were not willing to discuss the abortion option—we could not simply transfer that client to another staff member to learn about abortion after she heard the first two options.  In a program such as the Healthy Start Program that would be completely unworkable, because providers are visiting patients in their home, so there is no one else available to continue counseling.  And assigning the client to a new provider would undermine the efficacy of the program, which is intended to create continuity in health care providers for patients who otherwise endure multiple clinical transitions from their pregnancies, to giving birth, to postpartum and pediatric care.  As an administrative matter, in a health center

14

setting, this would interfere with client flow, inconvenience other clients, and lengthen office visits for clients who already have limited time.  Further, our health centers accept walk-in clients, so it would be impossible to predict in advance what services will be needed on a given shift—and even when patients have scheduled appointments, they may ultimately request other treatment, counseling, or referrals about different services.

39.    But more importantly, transferring clients to a different staff person sends a not-so-subtle message to the client that the PHS counselor is making a judgment about the abortion option and cannot even discuss it.  This is contrary to our non-judgmental approach and unacceptable.  Participation in our programs is voluntary, and disruption in the patient-provider relationship through the denial of a counseling request could not only disrupt the candor in the relationship, but could end the patient's participation in the program, leading to negative health outcomes for them and their families.  I have no doubt that an interaction during a nurse's home-visit appointment that leaves the patient without access to the abortion she needs, and with a feeling that her PHS provider judged her for wanting an abortion, will be the end of that client relationship.  And many of our clients learn about us through word-of-mouth—we do minimal marketing or advertising—so if trust in PHS is compromised, needy clients will simply not come to PHS for any of their other health and social services needs, and ultimately, they will not get the care they (and their young children) need, which would have broader public health consequences as well, including an increase in sexual transmitted infections, undetected cancers, and unwanted pregnancies, among other effects.

40.    Additionally, arranging to transfer patients assumes that we will know about the staff person's objection and could plan accordingly, but the Rule does not ensure that we are aware of what services our staff will refuse to provide.  As described above, I am gravely

concerned that, under the Rule, we may not even know if one of our staff members are withholding information or services from their patients, putting us at risk of violating our legal and ethical obligations, and risking our patients access to the critical, often life-altering, care they need and to which they are entitled.

41.     This concern is not limited to counseling regarding abortion services, but extends to other PHS health services and counseling.  Many of our health care providers work with patients to develop their long-term reproductive life plan, which sometimes includes counseling, referring for, and coordinating access to permanent forms of contraception through sterilization. Moreover, PHS is ahead of the curve in targeting high-risk populations, to ensure that those living with HIV/AIDS are connected with high-quality care, including LGBTQ individuals. However, given the Rule's broad definitions and confusing requirements, it is foreseeable that some providers will invoke the Rule to refuse basic care to patients simply because of their gender identity or sexual orientation.

42.     Our sub-recipients' facilities will face the same challenges.  Although we have a rigorous application and screening process, sub-recipients that already receive qualifying federal funds would be subject to the same restrictions we are under the Rule, and would be unable to confirm whether staff will request an accommodation and then refuse to provide the services. Likewise, once a sub-recipient is accepted to our grant programs, they are subject to the same accommodations requirements, potentially preventing us from fulfilling our grant obligations to the detriment of our patients.

43.     The ramifications of violating the Rule are particularly expansive, because my understanding is that PHS can be held liable for violating the Rule if one of our sub-recipients violates the Rule.  That means that all of PHS's federal funding could be put in jeopardy due to

the actions of a sub-recipient. And because PHS is a Title X sub-recipient for New York, should PHS violate the Rule, that would put all of the state of New York's federal funding at risk as well—thereby endangering all of their other sub-recipients' funding.

*The Administrative Costs of the Rule*

44.     In addition to the costs to our patients and the public health, the Rule imposes significant and immediate costs on PHS.

45.     I am aware that HHS estimates that the Rule will impose only minimal costs on each organization subject to its requirements. This is totally untrue. If the Rule is not blocked from taking effect, PHS would have to retain outside counsel to advise us and our Board of Directors. We would need to, with the assistance of legal counsel, review and revise our hiring and employment practices, policies, and forms, and our employee handbooks accordingly. This could be extraordinarily complicated not only because of the Rule itself, but also because many of our employees are covered by a union contract and the interaction between the union contract and the Rule will require additional time and resources to fully understand.

46.     Once our new policies and practices are in place, we would have to hold trainings for our staff and our sub-recipients to educate them about our new policies and procedures, to the best of our understanding. Compliance with the Rule will necessitate redesigning of clinical protocols, patient flow, and the responsibilities and time management of staff across organizations and service sites, as well as determining how to document and monitor that new workflows are in compliance. Undergoing such organization-wide changes and re-trainings will require that, in the interim, services will be delayed or curtailed, leaving some patients to go without care.

47.     In particular, we would also need to devote additional resources to observing

staff, as the Rule does not require an employee who refuses to provide certain services to notify a

supervisor in advance, and we would be limited in our ability to ask employees.  Unless we

know what our employees are doing in the counseling or exam room, we will be unable to ensure

the quality of our services.  PHS already works with its network of sub-recipients to conduct

compliance reviews using continuous quality monitoring and improvement practices as a core

component of project management, to ensure the delivery of high quality family planning and

related preventive health services. We also devote substantial time and energy to educating staff

on the standards for non-judgmental, comprehensive reproductive health care, with the

assumption that they will comply.  Unless the Rule is blocked, PHS's Program Directors and

other staff will need to spend even more time observing new hires and supervisors may need to

do more frequent observations of employees and volunteers as they interact with clients in order

to assure continued high quality of care.  We would also need to review and revise our current

grievance procedures for clients, and spend more time monitoring such grievances.  However, it

would be impossible to observe every client interaction, so there will be inevitable gaps in

services for clients if staff can refuse care without notifying PHS.

     48.     I may also need outside legal counsel to determine how to provide services under

some of the Rule's requirements that appear to conflict with mandates of other federal laws, as

well as New York laws, that we are also obligated to follow.  Under New York law, for instance,

health professionals are prohibited from "abandoning or neglecting a patient or client under and

in need of immediate professional care, without making reasonable arrangements for the

continuation of such care."[3]  New York law also specifically mandates informed consent for

---

[3] 8 NYCRR § 29.2; *see also* N.Y. Educ. Law § 6530 (defining professional misconduct as the same).

patients.[4]  Under our Title X grant, we must likewise provide non-directive options counseling and a broad range of contraceptives.  I would need guidance to navigate complying with the Rule's proscriptions, while still meeting our legal and contractual obligations.

49.     We will also be required to devote significant staff resources to a job that does not exist today: tracking and maintaining the data necessary to demonstrate that PHS and its sub-recipients are in compliance with the Rule.

*The Rule's Impact on PHS's Ability to Compete for Title X Funds*

50.     PHS is not only concerned about losing Title X funding should it violate the Rule. Even if PHS complies, the Rule would allow other organizations to compete with PHS for Title X funds, even when those institutions refuse to provide non-directive options counseling to their patients—a fundamental requirement of Title X—because to reject them would be an adverse action, prohibited by the Rule.  Through the Rule, HHS is significantly lowering the barrier for entry into the Title X program, and it is the patients who will suffer.  If PHS loses Title X grant funding to other organizations that object to providing the full range of reproductive health care, counseling, and referrals required under Title X, then PHS will have to cut Title X programming and services, and our former patients will not be able to access the services they need.

51.     PHS will also be forced to reconsider whether it will participate in the Title X program at all.  While PHS has a longstanding history of successfully competing for Title X funds and administering the program, the Rule's new requirements would be costly and perhaps impossible to implement.  It is deeply concerning that violating the Rule, which PHS is subject to in part because of its participation in the Title X program, could put in jeopardy all of PHS's federal funding, implicating all of our programming beyond the reproductive health areas.  As a

---

[4] N.Y. Pub. Health L. § 2805-d.

19

result, PHS may not be able to participate in the Title X program if bound by the Rule.

52.     The loss of federal HHS dollars would be devastating to PHS and to the tens of thousands of clients we serve, particularly those living deepest in poverty.  Even if they are able to access other health care providers, there are few other options for reproductive health care so patients will have to wait longer for appointments, and not all providers prioritize continuity of care, cultural sensitivity, and patient dignity as we do.  By contrast, we have provided health care in these communities for decades, and worked hard to build up trust among those who may otherwise be reluctant to seek care through a variety of strategies, including recruiting linguistically and culturally competent staff.  In some cases, PHS has been serving clients for an entire generation.  Additionally, low-income clients often have the least flexibility in their schedules due to their job schedules, lack of adequate childcare options, or other reasons.  For these reasons, at PHS we offer a variety of options for clients, including visits to our health centers, home visits, and after hours care.  But we could not do this if we lost our federal funding.  If this happened, we would have to cut back on services and close our own health centers—not to mention the impact on our sub-recipients and the sites that they run.  Cuts in services to patients will cause them irreparable harm, as well as degrading public health.

53.     If PHS were no longer able to provide family planning services, it would have an immediate and irreparable impact on vulnerable communities in particular.  For example, PHS and its sub-recipients all provide services designed for teens and young adults, and in 2017, adolescents 19 or younger comprised 16% of all PHS' Title X Family Planning Program clients.  But if adolescents seeking respectful, confidential care feel stigmatized due to a denial of treatment, counseling, or a referral, they are unlikely to return for additional services, cutting off what is, in some cases, their only source of sexual health education and care.  We also serve a

significant portion of undocumented immigrants, for whom we are often their only option to access health services.  If we violate their trust by refusing services, then the consequences can be dire if they are unwilling to return to our health centers and cannot find assistance elsewhere. I note that this erosion of trust will exacerbate the widely reported decreased enrollment in Medicaid and use of health care (including family planning) and other services by eligible individuals due to fear of punishment arising from the publication of proposed changes to the public charge determination.

*      *      *

54.    If the Rule is not blocked, PHS will immediately face a Hobson's choice: attempt to comply with the Rule (depriving untold numbers of our patients of the services to which they are legally and ethically entitled, damaging our longstanding reputation as health care providers, incurring tremendous compliance-related costs, and risking being found in violation of other state and federal laws governing patient care) *or* decline millions of dollars in federal funding (forcing the discontinuation of services and even closure of some health centers, and leaving the thousands of high-risk patients who depend on us with few, if any, options).  Of course, even if we attempted to comply with the Rule, some of its requirements are so vague, that we could nevertheless be found out of compliance—and even if we are found out of compliance and attempt in good faith to come into compliance, the Rule still gives HHS the right to withhold any or all of our federal funds during that process.

55.   For all these reasons, I ask the Court to prevent the serious harm the Rule would immediately inflict on both our patients and on PHS itself by stopping enforcement of the Rule.

I declare under penalty of perjury that the foregoing is true and correct.  This declaration was executed on June <u>17</u>, 2019, in New York, New York.

_____
Lisa David